HENRY BECK

*v.*

MARY BECK.

[Decided January 31st, 1910.]

1. In order to establish a gift of personal property by husband to wife, there must be clear and convincing evidence of delivery by the husband to the wife with the intention of divesting himself of all dominion and control over it, and of vesting title in the wife.

. 2. Where a husband and wife in humble circumstances both labored for the .mutual betterment of their condition, all the earnings being delivered to the wife, who acted as the treasurer of the family, such facts were insufficient to justify a presumption of gift on the part of the husband of his earnings to the wife, and waiver of all interest therein.

3. Where a husband and wife engaged jointly in operating certain saloons, the proceeds of which were delivered into her custody as were also the earnings of the husband from other sources, and those of the children, all being held by her in a common hoard, from which she purchased real estate, taking the title in her own name, from which, after separation, she endeavored to exclude him, they would be held in equity to own the property as tenants by the entirety.

Heard on bill, answer, replication and proofs in open court.

This is a bill filed by a husband against a wife to have property standing in her name decreed to be his. The facts will appear in the discussion of the proofs.

*Mr. Fred Dieffenbach, Jr.* (with whom was *Mr. Squier,* of the New York bar), for the complainant.

*Mr. August Ziegener* and *Mr. J. Merritt·Lane,* for the defendant.

GARRISON, V. C.

The parties are Germans and were married in 1885, at which time the man was employed at small wages in a brewery and the woman was a domestic servant. He was then aged twenty-six and she was twenty-three. They went to live in modest quarters in a flat in New York, and he gave to her each week all of his wages earned at the brewery. They only paid eight or ten dollars a month for rent. The husband had about $350 at the time of their marriage, and the wife says that she had $100, although the husband denies this.

Still living in New York, they next moved into little better quarters, where they paid $12 a month rent, and continued there until 1892, when they moved to a house in which there was a saloon, at Fifty-seventh street, between Second and Third avenues. Here the rent was either twenty-five or twenty-seven dollars a month.

In the place in which they lived immediately before they moved to Fifty-seventh street, and in Fifty-seventh street, there were boarders. All told, some boarders were kept during a period of about four years.

The husband opened a saloon in the premises on Fifty-seventh street, having purchased the business for $1,300, $600 of which he paid in cash, and gave a mortgage for the $700 balance. Of this $600 the wife contributed $200, and, subsequently, got it back by taking it from time to time out of the earnings of the business.

The earnings from this saloon went partly, if not wholly, to the wife, as did also all of the money that was taken in from the boarders. This continued until 1895, when they sold this business for $1,300, the money going to the wife. The $700 mortgage was taken over by the purchaser, so that what they got was clear.

They then purchased a saloon business at Morrisania, New York, he putting up $450 and the wife $300, which $300 was subsequently taken back by her out of the earnings of the business. The license fee for this saloon was raised from $200 to $800, and this was more than the business could stand, and they only stayed there for ten months, and practically lost the money that was put into that business. The fixtures of this saloon, when they took it, were encumbered by a mortgage held by one Stevenson.

They then lived in New York, not carrying on any business for some months, until, finally, in August of 1896, the husband met a friend who told him that he owned a property in Jersey City which had a saloon in it, and the husband came over to see it, and, subsequently, took his wife to see it, and they determined to take it. They purchased this property for $2,300, all cash. There is a dispute between the parties as to how this sum was made up. It is undisputed that $400 was borrowed from a Mrs. Opell, and $200 from the sister of the husband. The husband's testimony is that he furnished $600 and his wife $1,100. Her testimony is that she furnished the whole $1,700 that was not borrowed as above stated. They both agree that whatever money she furnished was what she had saved out of keeping boarders and the receipts of the previous saloon business, and his earnings given by him to her from time to time, as he always had given them to her up to this time, and continued to do down to the time of the separation between them, which will hereafter be described.

They immediately moved over to this property, No. 169 Columbia avenue, Jersey City, and opened the saloon. At first, the license was in the name of the husband. The wife at one time sought to have the license put in her name; but by reason of a rule of the excise commissioners of Jersey City, which forbids

the issuance of licenses in the names of married women, this was impossible, and, as the complainant remarked to the excise commissioner, that it made no difference in whose name the license was, it continued to be taken in his name.

The saloon business, in 168 Columbia avenue, was opened on the 1st day of December, 1896, and did not at first yield enough profit to support the family. The husband, therefore, sought work elsewhere, and secured a position at the American Lead Pencil Company, at Hoboken. His hours there were from seven in the morning until six at night, and he has worked there from 1896 to date. His wages began at $5.50 per week, and have gradually advanced until he is now receiving $14 a week. All of these wages were turned over every week by him to his wife, saving the following amounts, which she gave him back for his personal expenses: At first, $1.25; then $2.75, and finally, $3 a week.

The man would go to his work, as above stated, at seven o'clock in the morning, after having first opened the saloon at five o'clock. He would return about six-thirty and attend the saloon while his wife got her supper, and would then be in and about the saloon until it was closed. During the rest of the time the wife and the older children ran the saloon.

As the children grew up and became able to earn wages they went out to work and turned their wages over to the mother.

The $400 borrowed from Mrs. Opell and the $200 borrowed from his sister Lizzie Beck were repaid to them out of the earnings of the saloon business—or out of those plus his earnings and the earnings of the children, because they were all mingled.

This practice of mingling the earnings, and of the wife keeping all the money, continued down to the time of the separation of the parties on the 8th of November, 1908. The parties had been living unhappily together for some little time before this, and finally quarreled, and she refused to permit him to enter the house, and since that time has kept him out.

The saloon business was sold in December, 1907, for $1,100, which was paid to the husband, and which he handed over to the wife. Later, at Christmas, she gave him $500 in cash.

About five years after they opened the saloon, and on the 1st of July, 1901, a vacant lot at 39 Nelson avenue, which adjoined the saloon property on the rear and through which access could be gained to a street, was purchased in the wife's name for $625, which was paid in cash out of the joint hoard in the hands of the wife.

On the 18th of December, 1905, 171 Columbia avenue was purchased, and $1,500 cash was paid out of the same source, and the deed taken in the wife's name.

On the 4th of October, 1906, No. 169 Columbia avenue was purchased out of the earnings of the business, and $2,200 cash was paid for it out of the same source, and the title was taken in the wife's name.

The husband testifies, with respect to the first purchase of property, namely, 168 Columbia avenue (that in which the saloon was), as follows:

"We spoke together before we bought the house, and my wife says 'It is better I bought the house in my name on account of the mortgage that David Stevenson holds in Morrisania for that saloon.' The mortgage was about nine hundred dollars, and she says 'It is better I buy the house in my own name on account of the nine hundred dollar mortgage of David Stevenson,' and she says 'It belongs just the same to you and to me.'"

She denies that she suggested that the title be taken in her name on account of the Stevenson mortgage, and I think it likely that she is telling the truth with respect to this, because the Stevenson mortgage was not given by Beck, and he was not in any way liable upon it. It is, of course, possible that people as ignorant as these people are may have thought that they were liable on a mortgage which was on the fixtures when they bought them. The wife does not give us what actually happened at this time, but here, and throughout the case, tries to suggest that the man was drunken, shiftless and lazy, and that she was the earner, and that he recognized this and acquiesced in her going into business by herself for herself. This is opposed by every proven fact in the case. The man, from the earliest record we have of him to date, has been hardworking and saving.

There was practically no difference in the family custom from the beginning of their married life to the time of the separation. Whatever he earned in outside occupations went to the wife; the money from each saloon they ran was taken charge of by the wife; the children's earnings likewise went to her, as did the money paid by the boarders.

A curious and illuminating incident occurred during the cross-examination of the husband: The wife's lawyer was endeavoring to show, by subtle and clever methods, that a distinction existed between the way the parties treated the business in Jersey City and those theretofore carried on elsewhere. He said to Beck: "When you were up at Morrisania you ran it [the saloon] yourself?" And the answer was, "Yes, sir; no, *me and her* ran it all the time."

With respect to the vacant lot on Nelson avenue, it appears that the husband agreed that that should be bought to benefit the property that they already had; and when his wife consulted him about it, he agreed that it should be bought. He denies that he knew of the purchase of the other two pieces of property until after they were accomplished facts. The wife and one of the children testify that he did know, because they told him. They testify that he said, when the mother spoke of buying this property, or these properties, "All right; do as you like."

Upon this state of facts, the contention of the respective parties is, on the part of the complainant, that since all of the money was either earned by him, or by a business which belonged to him, or by his minor children living with him, or by his wife in keeping boarders at his home, he is entitled to the property purchased with such money; on behalf of the defendant, that since the properties stand in her name and were purchased with money which was in her hands at the time of the purchase, she must be held to be the owner thereof. In other words, each of the parties claims the ownership to the exclusion of the other.

In the case of *Fretz* v. *Roth* (*Vice-Chancellor Garrison, 1904*), *68 N. J. Eq.* (*2 Robb.*) *516,* I had occasion, in considering one of the questions which I thought involved in that suit, to investigate the state of the law with respect to the ownership of money earned by the husband and by the wife in a non-independent

business and accumulated in her hands. This case was reversed in the court of errors and appeals—*70 N. J. Eq. (4 Robb.) 764 (1905)*—but not upon any point touching the subject-matter now being dealt with.

The reversal was upon the ground that since there was a direct conveyance from the husband to the wife the presumption of gift was not overcome by the proofs and there was no legal evidence of a trust. The wife's contention was that the money arising as aforesaid from her husband's earnings and her own in a non-independent business, being in her hands, she owned the same, and the original purchase of the real estate having been made with such money, the property was hers, even though the title was taken in her husband's name. My examination into this subject was to ascertain whether that contention was sound, and I reached the conclusion that it was not, and upon this point the decision of the court of errors and appeals, *sub silentio,* would seem to have concurred. Because, if this contention was sound, then she was the equitable owner of the property from the beginning, and the subsequent deed of the husband to her would not have evidenced, as the court of errors and appeals held it did, a gift to her, but would have been merely the transfer of the legal title to the equitable owner. Unless, therefore, I was correct in holding that the moneys were his and the equitable and legal title his before he deeded to her, both the court of errors and appeals and I erred as to what the point of that case was because we each conceived the point to be whether he gave to her, or did not intend a gift. As before stated, if the property, by reason of the source of the money, was already in equity hers, his subsequent deed could not be considered in any view as a gift.

I made my investigation as to the law relating to the ownership of moneys accumulated as aforesaid with as much care as possible, and the conclusions which I then reached have since been confirmed by my experience in many similar cases.

My views are so fully expressed (at *p. 528 et seq.*), and the authorities which I was able to find are so fully cited and quoted in that opinion, that I shall not attempt to restate at any length my view, as a reading of that case will disclose the same.

Among people of the class of which these people are—the man a laborer, and the woman a servant—I cannot possibly believe that it is proper to find that the usual customary habit of such people, which is to constitute the wife the treasurer and to turn all money from every source over to her, should be held to constitute a gift of such moneys to her.

The court of errors and appeals, in the case of *Farrow* v. *Farrow, 72 N. J. Eq. (2 Buch.) 421*, held that "a gift of personal property from husband to wife must be clearly proved. There must be clear and convincing evidence of a delivery of the property by the husband with the intention of divesting himself of all dominion and control of it, and of vesting title in the wife." I cannot find from such custom or habit any such intention as the court in the above case just cited requires to be found to constitute a gift. I do not find that the husband intended to divest himself of all dominion and control of such moneys.

I do find an intention of a character hereafter defined and enforced.

In the case at bar the wife never engaged in any business apart from her husband. All the money that went into the purchase of these properties was either earned by the wife in keeping boarders or by the husband in whatever business he was engaged in, or in saloons jointly attended to; and the question to be determined is whether the fact that the title to the real estate thus purchased was taken in the wife's name is determinative of the question.

In *Fretz* v. *Roth* it was held to be such, because, as before pointed out, the court of errors and appeals found that the husband, having conveyed directly to the wife, there was no evidence of any kind which rebutted the presumption of a gift, and the principle of improvidence did not apply. · But this case is clearly distinguishable from *Fretz* v. *Roth,* because the conveyances to the wife in every instance here were from strangers and not from the husband. No citations are needed for the principle that presumptions of a gift from husband to wife may be rebutted.

There is no doubt in my mind that among the class which are low wage-earners, where the wife is almost invariably the treasurer, and all money from every source is taken care of by her, there is no intention to be inferred therefrom that she is the sole

owner of all such money. On the other hand, it will invariably be found (and has in many similar cases been found by me) to be the fact that such people intend the wife to have an interest in the money thus placed in her hands, or in that into which such money is put. And this I believe to be legally proper, because while the husband does not, in handing the money to the wife, intend to make a gift to her of all of it, he undoubtedly intends that she shall benefit therefrom; and while he does not specifically agree with her concerning the matter, there is, I think, a perfectly clear implication from their conduct that they are each jointly entitled to what is thus jointly made, saved and invested. And I think it perfectly clear, as I set forth more at length in the opinion in the *Fretz Case,* that the real intention is that it is a joint hoard, and that when real estate is purchased with such money, and title taken in the wife's name, I think the perfectly clear intention of the parties is that they own by the entireties.

They undoubtedly intend, with respect to such money and such real estate, to enjoy it in common during their lifetime, and to have it go to the survivor at death. And I know of no reason why a court of equity, when called upon to pass upon this question, should not give that intention effect.

One cannot read the testimony in this suit without reaching the conclusion that this man and wife were laboring jointly for a joint purpose, to accumulate what they could for each other. There is no doubt that the husband's strict common law right is to take all of his earnings and all of the earnings of his wife and children, and, subject to his duty to support her and them, to do as he pleases with the balance. There is, similarly, no doubt that if a husband passes personal or real property to his wife, it is presumably a gift to her. But it is beyond peradventure true that, among people of the humbler class, the usual course is neither one of these two. The man does not even keep his own earnings. All money, from every source, goes to the wife. And all through this suit it will be found that the husband speaks of the wife as "saving money," "that the money was given to her to save," and he never calls her to account for the money that she received personally from the boarders, or from any other source than himself.

I believe that it would be rank injustice to hold, in such cases, that all of the money, as against the wife, belonged to the husband; or that all of the money, as against the husband, belonged to the wife. I believe, as above stated, that it is the thorough understanding of such people, and therefore their intention, that such moneys are theirs jointly; and wherever it is possible for a court of conscience to give effect to this understanding and intention, I think it should do so.

I, therefore, in this case find that the presumption of a gift of the whole of this property to the wife is rebutted, and that it was the intention of the husband at the times that he permitted his wife to have all of the money, and the property in which the money was put, to vest her jointly with himself with an interest therein; and I therefore find that the properties in question are held by the wife as if she and he held by entireties, and will advise a decree accordingly.

The form of the decree will be settled upon notice. In determining upon the form the case of *Duvale* v. *Duvale (Court of Errors and Appeals, 1897), 56 N. J. Eq. (11 Dick.) 375*, should be consulted, since somewhat similar relief was therein granted.

If, by reason of the nature of the equity found in favor of the complainant an amendment of his bill is necessary, his counsel should move for and obtain leave so to amend.