# JAMES L. SPRINGER et al.

## vs.

# THOMAS L. SPRINGER et al.

### *Resulting Trusts—Payment of Purchase Money—Trusts Ex Maleficio.*

A resulting trust can arise, in favor of one paying the purchase price for property conveyed to another, only where the purchase money was furnished at or before the purchase, by the person in whose favor the trust is sought to be established.

p. 478

That plaintiffs advanced a small part of the sum necessary for the purchase of certain property, title to which was taken by defendant, their son, the balance of the purchase money being raised by mortgages on the property executed by the latter, and on his credit, did not give rise to a resulting trust as to the whole property in favor of plaintiffs, although they made their advancement for the purpose, and with the intention, of securing the entire title.

p. 478

One who acquires land or other property by fraud, misrepresentation, imposition, concealment, or any other such circumstances as render it inequitable for him to retain it, is in equity regarded as the trustee of the party who suffers by reason of the fraud or other wrong and who is equitably entitled to the property.

p. 480

A violation of a parol agreement to hold property in trust for another may, under certain circumstances, be sufficient evidence of fraud to raise a trust in favor of the promisee, and such an agreement may be inferred from the acts and conduct of the parties, as well as from their spoken words, as where a grantee, knowing from the statements and conduct of the grantor that the grant is upon trusts which the grantor believes he will carry out, accepts the grant under circumstances which to his knowledge justify such a belief.

pp. 481, 482

Where a father, having bought property in which he invested his entire resources, in the hope of securing a home, had the

title put in the name of his son, without any intention of giving it to him, but for the sake of convenience, and the son knew that the father understood and believed that he would hold it in trust for his parents and surrender it on demand, and the son, during seventeen years, suffered his parents to act as the owners, spending considerable sums on the property, he·became a trustee *ex maleficio* for them, and could not thereafter repudiate the trust and treat the property as his own.     p. 482

On an issue as to whether certain property standing in defendant's name and occupied by plaintiffs, his parents, was subject to a resulting or constructive trust in favor of plaintiffs, a written statement, prepared by defendant a number of years previously, of the terms and conditions under which the plaintiffs were to be allowed to occupy the property, was properly excluded as a declaration of a party in his own favor.     p. 483

*Decided January 17th, 1924.*

Appeal from the Circuit Court No. 2 of Baltimore City (DUKE BOND, J.).

Bill by Thomas L. Springer and Mary G. B. Springer, his wife, against James L. Springer and Celeno Springer, his wife, asserting a trust in certain property. From a decree for plaintiffs, defendants appeal. Affirmed.

The cause was argued before BOYD, C. J., THOMAS, PATTISON, URNER, STOCKBRIDGE, ADKINS, and OFFUTT, JJ.

*John T. Tucker,* with whom were *John B. Deming* and *Keech, Deming, Kemp & Carman* on the brief, for the appellants.

*G. Franklin Onion* and *Richard S. Culbreth,* for the appellees.

OFFUTT, J., delivered the opinion of the Court.

The Reverend Thomas L. Springer, a Presbyterian minister, one of the appellees in this case, with his wife and family, in or about September, 1905, moved into a house, known as 601 East 34th Street in Baltimore, the leasehold

in which had been conveyed by Clarence W. Horner to James L. Springer, a son of the appellees, and one of the appellants, and the appellees have continued to occupy the house since that time. In 1911 the reversion in the property was conveyed to James L. Springer, who borrowed the money to pay for it on a mortgage to the Institute Perpetual Building and Loan Association, so that after that date the fee simple title to the property was vested in James L. Springer, subject to a lien of the building association for $2,080. In 1922 Thomas L. Springer demanded that the property, which then stood in the name of his son, James L. Springer, be conveyed to him and his wife, on the ground that James L. Springer held it in trust for them, and, upon the refusal of James L. Springer to convey it to them, they filed the bill of complaint in this case, in which they asked that the court decree that the defendants, James L. Springer and Celeno Springer, his wife, be decreed to hold the property in trust for the appellees, and that they be required to convey the property to them subject to a lien in favor of the appellants for $2,126.41 for the balance due on a mortgage executed by the appellants on the property which they had paid. The appellants in their answer denied that they held the property in trust, and evidence in connection with that issue was taken in open court in the Circuit Court No. 2 of Baltimore City. At its conclusion that court passed a decree in which it declared that the appellants did hold the property in trust for the appellees, subject to a lien of $2,634.29, and directing the appellants, upon the receipt of that sum, to convey the property to them, and from that decree this appeal was taken.'

The first question raised by the appeal is whether James L. Springer, the appellant, when he acquired the title to the property, held it in trust for the appellees and, as that is a question of mingled law and fact, a consideration of it requires us to review the evidence relating to it.

Thomas L. Springer, one of the appellees, testified that he was in August, 1922, seventy-three years of age; that just before the property in question was purchased, he was living

with his family just across the street from it, and that he determined to move from that place because the owner of it was continually raising the rent, "and it was getting to be so continuous and it was likely to be exorbitant and we tried to buy a place and found this"; that at that time his family consisted of his wife and seven children, of whom Gordon was the oldest and James the second in age; that the family was supported by "something of an income" which he had and contributions of those of his children who were of age; that when he had determined to move, his attention was called to the fact that the property involved in this suit was for sale, and upon inquiring of the owner concerning it he was referred to the Institute Building and Loan Association, and accordingly he called upon Mr. Charles J. Bouchet, its representative and attorney; that as a result of his negotiations with Mr. Bouchet, acting for himself and his wife, he agreed to buy the property subject to a $95 ground rent for $1,150; that the purchase money, and the incidental expenses amounted to $1,184.80 and that that sum was supplied from the following sources: the building association advanced seven hundred and eighty or ninety dollars, secured by a first mortgage; Mrs. Springer supplied $255; James L. Springer, $100, and Thomas L. Springer provided the balance needed to make up the $1,184.80; that when the sale was consummated, instead of having the property conveyed to him, he had the title put in the name of his son, James L. Springer. When asked why he did that the witness said: "For strictly prudential reasons, physically based. My eyes had been giving me a great deal of trouble and I was under the apprehension I was having a cataract and would have to go under an operation or lose an eye, which would incapacitate me for my work very largely and thus prevent any definite settled revenue coming into the home, and for that reason, James being the next oldest, I put it in James' name because he was earning something of an income and that he would be the one standing responsible to meet these things that demanded

a man's presence in the building association and negotiations like that that a woman could not take up so readily and for that reason I had it in his name with the expectation and understanding in the family that in case of the operations coming out successfully or my health being such that the deed would be put in my name—I mean the deed put in my name." At that time his oldest son, Gordon, was about to be married and in fact a week later he was married and went to live in his own home. James lived at home for two or three years after that and until his marriage, when he too moved away. That in 1895, he learned that a Mrs. Patterson, who owned the ground rent, desired to dispose of it, and he arranged through Mr. Bouchet to purchase it, and to have the purchase financed by the building and loan association which held a mortgage on the leasehold, and in carrying out that arrangement, the property was conveyed to his son, James L. Springer, who held the leasehold, and he then executed a mortgage on the fee simple property to the building association, covering the balance due on the mortgage on the heasehold, which was released, the purchase price of the ground rent and the incidental expenses amounting in all to $2,080; and that in 1915 that mortgage was released and a new mortgage to the same association for $2,210 executed to cover the balance due under the mortgage so released and an assessment for street paving. He further testified that from the time he moved into the property in 1905 he paid the water rent, ground rent, taxes and insurance, and for all needed repairs to the house, and that in the year prior to that in which he testified he had spent twelve hundred dollars on repairs and improvements to the house. In addition to these payments he further testified that he had from time to time made payments on the principal due under the several mortgages on the property as well as the interest accruing on them.

Mrs. Mary G. B. Springer, the mother of James, testified that when the property was bought in 1905, she had contributed $255 to the purchase price and that her son, James, had furnished $100. She also testified that no part of that

money had ever been returned to her, and she denied that she had loaned it to James. On cross-examination she was shown a paper purporting to be a receipt for interest on that loan signed by her, but she was unable to say after examining it that she had signed it. Cortland B. Springer, a brother of James, testified that he was present at various times at "family gatherings" at which James was also present, when it was decided his father should purchase a home for the family, and that he himself loaned his mother $50 on account of the purchase money. Mrs. Mary Springer Cross, a sister, gave the following testimony: "Q. Can you give us any conversation spoken of in reference to the purchase of this property of which Mr. James L. Springer was present? A. You mean I am to tell my story in my own words? * * * I remember distinctly that we as a family knew that there must be some change made in our home relationship and my father had reached the period in life that he was becoming too old to take a regular church. In all probability his eye sight was failing and he had not reached the period of retirement for our church. We were at a crucial time, a time that meant each one of us had to do our best to keep the home life going and we had to make some plan by which we could all keep our home and our family life intact and after a great many conferences, I do not mean conferences where they were called to order by prayer, but I mean as a family, we had family conflabs of what we were going to do in the future and instead of paying the rent continuously, the wise thing was to buy a home and all contribute to that, and we found, as neighbors will do, that our neighbor across the street was moving and his place was for sale and my father at once inquired as to the terms of the sale, the price, etc., and we found that we could by all clubbing together and all bearing our share of the burden we could buy this property which should be done * * *. My father paid for the house and my mother and my brother, James, put some into it. We all paid for the house * * *. I was in business myself on a very small salary, but in order to make it possible for papa to make payment on it

and do his share I took over his share in the upkeep of the
house to *ran* the household expenses so his money could go
into the payment of the house. * * * Do you know anything
about the contributions that were actually made? When I
say contributions, I mean contributions that have been re-
ferred to in the testimony of the witnesses, the two hundred
and fifty-five dollars in particular that has been testified.
Do you know anything of your own personal knowledge about
that? * * * A. I know that my mother had this money in
bank and that she received it just a little while previously to
the time we bought the house and I know that she put it into
the property. She herself contributed $255, which was at
that time in bank." Charles J. Bouchet, Esq., a member of
the Baltimore bar, testified that he had no definite recollec-
tion of who paid him the cash when the property was con-
veyed to James L. Springer, but that Thomas L. Springer
was present, and he it was who almost invariably paid the
building association dues and interest, although he said the
association actually looked to James L. Springer as the holder
of the legal title for payment, and that they felt the more
secure because they knew he owned another house on St.
Paul Street.

James L. Springer in his own behalf gave this version of
the transaction, which differed in every essential particular
from that given by his father. He said: "The fact that the
rent had been raised once and was threatened to be raised
again and the fact that the property was for sale at 601
Windemere Avenue; my older brother was to be married on
October 7th, which he was, I felt it threw an additional bur-
den on me to help support and keep the family together. I
at that time was employed by the express company and went
home to lunch and I was quite worried and concerned for a
long time and in passing through the alley which led up to
this 601 Windemere Avenue this sign struck me in the face
every noon and I finally conceived the idea of buying it. * * *
I meditated over it for several days. There was quite a cloud
in my way, because I had resigned my position to take effect

October 1st, 1905, and go into the mail service as a substitute.
\* \* \* I conceived the plan and suggested it to my father, I
asked him to go and see Mr. Clinton Watts, who was the
agent for the property for Mr. Horner, which he did, and
found out the price and it could be financed and reported
to me that it could be done. I then advised him to go ahead
and see what he could do and I would sign the papers. There
was a clear and distinct understanding that the property was
to be mine and that in lieu of rent they were to keep up the
expenses until such time as the property was paid for and
then they could live there the rest of their lives paying the
taxes and water rent." He further testified that he had
borrowed the $255 from his mother and he had paid her back
practically all of it, and when asked "whose money was given
in exchange for the property?" he said: "Mine. \* \* \* One
hundred dollars of it and some odd cents of my own money.
Two hundred and fifty-five dollars of it I borrowed from my
mother on my personal responsibility, giving her I think a
note or a statement to the effect that I would repay with
interest at six per cent," and he also said that he had paid
the expenses incident to the transaction. In referring to
the mortgage given to secure money to pay for the paving
assessment he said: "Windemere Avenue, 34th Street, had
been paved and the York Road had been paved and necessi-
tated the placing of concrete walks around the front and side
of his property leading up to the church also. The work was
done and my father hadn't the money to pay for it and the
contractor or builder said suit would be brought and this
money was raised in this way to avoid suit." He also said
that he had paid off the last mortgage given on the property.
He further testified that in April, 1922, a demand was made
upon him to transfer the property to his father, and that,
after an interview with his father in reference to that de-
mand, he wrote him the following letter:

"Dear Sir:

"I hereby notify you to send your weekly payments
of rent on property No. 601 East 34th Street, Balti-

more, Maryland, amounting to $9.80 directly to me at
No. 2526 St. Paul Street, Baltimore, instead of to the
Institute Perpetual Building and Loan Association, be-
ginning on Monday, July 17, 1922. I beg to call to
your attention that there is to date a default in your
weekly payments of rent amounting to $2,125.00, an
immediate payment of which is hereby demanded.

> "Very truly yours,
> "James L. Springer."

Mrs. Celeno J. Springer testified that she knew that her
husband, James L. Springer, had received a letter from his
father requesting him to convey the property to Harry
Springer, his brother. James L. Springer, with the permis-
sion of the court, was recalled and testified that he had paid
all expenses on the property including taxes and water rent,
and also made payments for repairs and improvements from
1905 to 1909, and in the course of his testimony he produced
a "memorandum" of his expenditures. When examined
about the "memorandum" he gave this testimony: "Q.
What is that memorandum? A. That is a memorandum of
expenses paid on the property of repairs and improvements
and taxes and water rent. Q. When was that memorandum
made by you? A. This was made by me from my book just
for this purpose recently. * * * When were the entries made
in your book? A. At the time the expenses were made. Q.
And made in your own handwriting? A. Made in my own
handwriting, showing the dates." Cross-examined as to this
memorandum he testified: "Now do I understand that these
payments were made in the year 1909? A. No. Q. And
that you paid the ground rent from 1905 to 1909? A. I did
not say anything about the ground rent, sir. Q. Well, isn't
that this item? A. That is on that item of the memoran-
dum of the account of ground rent paid, but I said nothing
about ground rent. As a matter of fact I did pay some of
the ground rent before. Q. Then you offer a paper here
taken from your own books and the first item is ground rent,

$427.50? A. The ground rent is not taken from my memo-
randum book. * * * Q. I know, but for the purpose of show-
ing that your testimony is correct and that you are not rely-
ing entirely on your memory you produce a memorandum
which you say was taken from your books? A. I did not
say the memorandum as to ground rents was taken from my
books."

This is substantially all of the testimony which bears upon
the question under consideration. Its effect naturally de-
pends upon the credibility of the several witnesses who gave
it. James L. Springer's version of the transaction depends
almost entirely upon his own statement, and is in direct con-
flict with that given by his father. The learned judge who
decided the case in the lower court elected to believe the story
told by the father and in that conclusion we fully concur.
James, the son, was contradicted by his father, as to the
circumstances of the transaction and the payment of current
expenses on the property, and by his mother, as to the $255
which she advanced on account of the purchase of the prop-
erty, and by his sister and his brother as to the circumstances
under which the family determined to buy the property, and,
it may be inferred, by himself as to the memorandum and
book containing a record of payments which he claimed to
have made on account of the property, while his father was
corroborated, in most of the essential details of his narrative
as to the purchase of and payment for the property, by mem-
bers of his family, and by the attorney who represented the
building association which financed the purchase. We will
therefore deal with the case upon the assumption that the
history of the purchase of the property given by Thomas L.
Springer the father is correct. That story reduced to its
essential details is this. Thomas L. Springer negotiated
for and bought the property in question. He paid all the
cash which was paid on account of the purchase price. For
convenience he had the title placed in the name of his son,
who executed a mortgage for the balance due on account of
the purchase price, and who knew that it was conveyed to him

to hold for his father and mother.   Thomas L. Springer from time to time made payments on account of the mortgage debt, paid the interest and current expenses on the property, and kept it in repair.   Later he bought the reversion, and caused a deed for that also to be placed in the name of James, who then held the leasehold, and who then gave a mortgage for the purchase price, and at that time no cash whatever was advanced by either the appellants or the appellees.   Subsequently that mortgage was released and another mortgage was executed by James to cover the balance due on the old mortgage, and an assessment for street paving, and that mortgage has been paid by James and released.   The appellees contend that these facts conclusively show that the appellant, James L. Springer, acquired and held the property in question for them, and that, upon paying all expenses incurred by the trustee in his administration of the trust, they are entitled to have the property conveyed to them.   Whether the facts do show that is the substantial question in the case. Before commenting upon the facts referred to, and their relation to that question, we will advert to the legal principles controlling them.

Speaking very broadly, trusts fall into two classes, express trusts and implied trusts.   With the former we are not concerned in the case, for there is nothing in the record to show any express declaration made or assented to by the appellants, from which we can infer that the property was conveyed to James L. Springer upon the trusts alleged by the appellees in their bill of complaint, and if a trust is to be established in this case it must be implied from the facts and circumstances under which he acquired it.   Implied trusts are those which are raised by legal implication from the facts and circumstances of the case to effect the "presumed intention of the parties or to satisfy the demands of justice or to protect against fraud," 39 *Cyc.* 24, etc., and they are generally divided into two classes, "resulting trusts" and "constructive trusts."   In view of the very full discussion of the law of

"resulting trusts" to be found in the case of *Dixon* v. *Dixon,* 123 Md. 44, it becomes unnecessary for us in this opinion to do more in that connection than refer to that case. Its facts, briefly stated, are that Richard H. Dixon in 1865 acquired a farm in Dorchester County, Maryland, which he later, in 1907, conveyed to Helen V. Dixon, his second wife, and which she in turn sold to various purchasers. At the time he bought the farm his first wife, nee Eliza Stewart, was living. After his death his children by that marriage filed a bill to have the conveyance from him to his second wife, and the subsequent conveyances of the property by her, set aside on the ground that his first wife had supplied the purchase money for the property upon the understanding that her husband would purchase it for her, but that instead of doing that he had the title put in his own name, and that consequently he held the property in trust for her and her heirs. In discussing the legal principles applicable to those facts, the court, speaking through JUDGE BURKE, said in part: "The general rule is well settled that when the purchase price is paid by one person and the title is taken in the name of another a resulting trust arises in favor of the person paying the purchase money, and the holder of the legal title becomes a trustee for him. There are, however, exceptions to this general rule: Thus, where a person purchases land and pays the consideration with his own money, but causes the title to be placed in the name of one to whom the purchaser is under a natural or moral obligation to provide, such as in the case of parent and child, or husband and wife, no presumption of a resulting trust will arise, but it will be regarded *prima facie* as a gift or an advancement for the benefit of the nominal purchaser. In either case, the presumption is one of fact and not of law, and the real intention of the parties to the transaction may be shown and the court will give it effect if it does not contravene some rule of property or the policy of the law. * * * The rule of law thus laid down is subject, however, to this qualification:

'If the person in whose name the conveyance of property is taken be one for whom the party paying the purchase money is under a natural or moral obligation to provide, no equitable presumption of trust arises from the fact of the payment of the money, but, on the contrary, the transaction will be regarded, *prima facie*, as an advancement for the benefit of the nominee. In that case, therefore, it will be for the party who seeks to establish a trust in behalf of the payer of the purchase money to displace, by sufficient evidence, the presumption that exists in favor of the legal title.' * * * In *Walsh* v. *McBride*, 72 Md. 45, it is stated that: 'In all species of resulting trusts, intention is an essential element, although that intention is never expressed by any words of direct creation. 3 *Pomeroy's Eq.*, sec. 2031. As the trust results to the real purchaser by operation of law, which is merely an arbitrary implication in the absence of reasonable proof to the contrary, the nominal purchaser is at liberty to rebut the presumption by the production of parol evidence, showing the intention of conferring the beneficial interest. The trust will not be raised in opposition to the declaration of the person who advances the money; nor in opposition to the agreement of the parties on which the conveyance is founded; nor to the obvious purpose and design of the transaction.' 'Payment or advance of the purchase money by the party claiming the trust, before or at the time of the purchase, is indispensable.' *Hays et al.* v. *Hollis*, 8 Gill, 357; *Hollida* v. *Schoop*, 4 Md. 465; *Brawner* v. *Staup*, 21 Md. 328." Such a trust may arise "(1) where an estate is purchased in the name of one person, but the money or consideration is paid by another; (2) where there is a disposition of property upon trusts which are not declared, or are only partially declared, or are illegal; (3) where a conveyance is made without any consideration and it appears from the circumstances that the grantee was not intended to take beneficially; (4) where a person standing in a fiduciary relation uses fiduciary funds or assets to purchase property in his own

or a third person's name; and (5) it has been said that a resulting trust will arise in certain cases of fraud where transactions have been carried on *mala fide*; but the trust which arises in the case of fraudulent transactions is more properly classified as a constructive trust and not as a resulting trust."

The facts of this case are not in our opinion sufficient to gratify the requirements of the rule defining "resulting trusts." From what has been said such a trust can only exist where the purchase money was furnished at or before the purchase by the person in whose favor the trust is sought to be established. *Hollida* v. *Schoop*, 4 Md. 465. In this case only a part of the purchase money was advanced by the appellees at or before the purchase of the leasehold property, and none of the purchase money for the purchase of the reversion was supplied by them. The reversion was paid for entirely from the proceeds of a mortgage loan executed by the appellants, and procured upon their credit and the security afforded by the property which stood in their names, and of which the property involved here was only a part, and the greater part of the purchase money paid for the leasehold was also raised by a mortgage, executed by James L. Springer, upon the property which the appellants now declare he held in trust for them. It is true that they did advance a part of the purchase money for the leasehold, but they did so, not with the intention of acquiring a fractional interest in the property, but for the purpose and with the intention of securing the entire title to it, and for that purpose it was not sufficient. Whether it was sufficient to create a trust in their favor for an interest in the property proportioned to their contribution is a question as to which there is some conflict in the authorities, but which in view of the conclusion we have reached in this case it becomes unnecessary to discuss here.

The other class of implied trusts to which we have referred is that of "constructive trusts." The distinction between such trusts and express or resulting trusts is stated in *Perry on*

*Trusts,* par. 166, as follows: "The trusts thus far considered arise from the express agreements and intentions of the parties, or from their intentions *implied* from their agreements, or *result* from their express or implied agreements. These trusts arise, result, or are implied from the contracts and relations of the parties. The intention of the parties as manifested in contracts made in good faith is the foundation of them. There is another large class of trusts which arise from frauds committed by one party upon another. Thus, if one party procures the legal title to property from another by fraud or misrepresentation or concealment, or if a party makes use of some influential or confidential relation which he holds towards the owner of the legal title, to obtain such legal title from him upon more advantageous terms than he could otherwise have obtained it, equity will convert such party thus obtaining property into a trustee." A satisfactory general definition of such trusts is to be found in 26 *R. C. L.* page 1232, where it is said: "Constructive trusts are such as are raised by equity in respect of property which has been acquired by fraud, or where, though acquired originally without fraud, it is against equity that it should be retained by him who holds it. They arise purely by construction of equity, independently of any actual or presumed intention of the parties to create a trust, and are generally thrust on the trustees for the purpose of working out the remedy. The trusts are not what are known as technical trusts, and the ground of relief in such cases is, strictly speaking, fraud, and not trust. Equity declares the trust in order that it may lay its hand on the thing and wrest it from the possession of the wrongdoer. Constructive trusts may be divided into three classes: first, trusts that arise from actual fraud; second, trusts that arise from constructive fraud; third, trusts that arise from some equitable principle independent of the existence of any fraud." And to the same effect is the following statement in *Coyne* v. *Supreme Conclave,* 106 Md. 54: "There is also a class of trusts which arise *ex maleficio,* and equity in order to reach the possessor

of what in conscience belongs to another turns him into a trustee." The "fraud" referred to in these definitions need not be actual but may be constructive, and one "who acquires land or other property by fraud, misrepresentation, imposition, concealment, or under any other such circumstances as render it inequitable for him to retain it, is in equity regarded as the trustee of the party who suffers by reason of the fraud or other wrong and who is equitably entitled to the property." And a violation of a parol agreement to hold property in trust for another may, under certain circumstances, be sufficient evidence of fraud to raise a trust in favor of the promisee (39 *Cyc.* 178), and such an agreement may be inferred from the acts and conduct of the parties, as well as from their spoken words. *Mead* v. *Robertson,* 131 Mo. App. 185; *Crossman* v. *Keister,* 223 Ill. 69, 8 L. R. A. N. S. 707. As where a grantee, knowing from the statements and conduct of the grantor that the grant is upon trusts which the grantor believes he will carry out, accepts the grant under circumstances which to his knowledge justify such a belief. *Ibid.,* 4 Ves. 10; *Suman* v. *Harvey,* 114 Md. 255, 256; *Ruhe* v. *Ruhe,* 113 Md. 601; *Clark* v. *Clark,* 139 Md. 42.

Returning to the facts referred to above, they are in our opinion sufficient to charge the property which James L. Springer acquired from Clarence W. Horner with a constructive trust in favor of the appellees.

As we have already said, no express declaration of a trust is to be found in the record, but on the other hand, from an examination of that record, the conclusion is inevitable that Thomas L. Springer bought the property, and put into it the entire family resources, scanty and insufficient as they were, in the hope of securing a home for his family, and that when he had the title put in the name of his son, James, he had no intention of giving him the property, but did so, as he says in his testimony, for convenience, and that James knew that and accepted the property upon that understanding, although he then intended to claim it as his own contrary to that under-

standing.   At the time the property was purchased the whole family, by funding their resources, were scarcely able to raise $400 in cash, and of this sum $255 came from the mother, who had received it in a legacy some time before. There was no apparent reason why the whole family should have spontaneously united in a plan to buy a house for James with that money.   If we may judge from the tone of his last letter to his father, filial obligations rested lightly upon him.   He at that time had no particular use for a house.   He was unmarried and living with his parents, and they were under no obligation to him, and had no greater affection for him than for their other six children, and there was therefore no known reason why his father should appropriate all the available funds in the possession of his family to the purchase of a house as an investment for his second son, James.   On the other hand it was a natural and a prudent thing for him to buy it as a home for himself and his family. He was compelled to remove from the house he then occupied because of the steadily increasing rents, his eyes had been troubling him, and he feared that he "was having a cataract and would have to go under an operation," which would interfere with his work and lessen his income.   He felt the need of being permanently settled.   What was apparent to him was also known to his family, and the question of buying a home was frequently discussed at family conferences at which James was present, and at those conferences it was determined that the father of the family should buy a home for the family.   When therefore the land was conveyed to him, James knew that his father understood and believed that he held it in trust and that he would surrender it whenever requested to do so by his father and mother, and that but for that belief the property would not have been conveyed to him and with that knowledge he accepted the grant.   And with that knowledge he suffered his father to act as the undisputed owner of the property for some seventeen years. He stood by and permitted his father to spend money not

only to pay the taxes, ground rent, water rent, interest, and part of the principal of the loans made for the purchase money, but also for repairs and improvements on the property, amounting in one year to as much as $1,200, without ever indicating that he claimed the property as his own. It is true that, if the appellees had rented some other house, that instead of paying these expenses they would have had to pay rent, but James himself negatives the hypothesis that these payments were in lieu of rent, by sending his father a bill for back rent amounting to $2,125. Without further discussion of this question, we think that the evidence in the case clearly shows that the father, Thomas L. Springer, bought the property as a home for his family, that he conveyed it to his son, James, upon the definite understanding that he should hold it in trust for his father and mother, and that James so accepted it. James did indeed execute certain mortgages on the property, but he did that as a necessary incident of the trust. They were executed in connection with the trust property and were but an incident of the trust estate, executed at the request of one of the *cestuis que trust* and in the performance of an arrangement made by Thomas L. Springer. Those mortgages and the purchase of the reversion, as well as the purchase of the leasehold, were all parts of a single plan, formed by the appellees, that of securing for themselves a permanent home. Having secured the title to the property upon the understanding that he would hold in trust for his father and mother, and having for so many years permitted them to act as the real owners of it, and to expend considerable sums of money upon it in the belief that they were the real owners of it, he cannot now repudiate his trust and treat the property as his own.

For if at the time he took title to the property he knew that it was granted to him because his father, who procured the grant, believed he would hold it in trust for the appellees and that but for such belief it would not have been granted to him, and yet notwithstanding that knowledge he determined to hold the property as his own, as he now says he did,

then he acquired it as the result of a fraud practiced upon the real owners, and is a trustee *ex maleficio* for them. *Brown* v. *Doane,* 86 Ga. 32, 11 L. R. A. 381; 26 *R. C. L.* 1236.

In the course of his examination James L. Springer was shown a paper dated in 1910 and asked to identify it. He said that it was a paper he had himself written and handed to his mother, in which he had set out the terms and conditions under which the appellees were to be allowed to occupy the property. The paper was then offered in evidence, but upon objection the court excluded it, and that ruling is the subject of an exception. Upon what theory such a paper, a mere voluntary hearsay statement of the witness, could have been admitted as evidence is not apparent, nor has the attention of this Court been directed to any authority which would support its admissibility, while under the general rule excluding the declarations of a party in his own favor it was clearly inadmissible. *Jones on Evidence,* sec. 235a. And while the contents of the paper are not before us and we cannot therefore pass upon its character, they were before the lower court and, in the absence of any showing to the contrary, it will be presumed that it was properly excluded.

Finding no error in the decree from which this appeal was taken, it follows that it must be affirmed.

*Decree affirmed, with costs to the appellees.*