MINNIE HAYWARD *v.* GEORGE CAMPBELL ET AL.
[No. 43, April Term, 1938.]

*Decided May 26th, 1938.*

The cause was argued before BOND, C. J. URNER, OFFUTT, PARKE, SLOAN, MITCHELL, SHEHAN, and JOHNSON, JJ.

*Joseph Sherbow* and *Solomon Liss,* with whom was *Max L. Berman* on the brief, for the appellant.

*Hugh A. Meade,* with whom were *Everett L. Buckmaster* and *Weinberg, Sweeten & Green* on the brief, for the appellee.

URNER, J., delivered the opinion of the Court.

The appellant's husband, Harry G. Hayward, died on July 10th, 1937. For a number of years prior to his death he held three policies of life insurance, of which his wife was the designated beneficiary. The policies were issued by the Monumental Life Insurance Company, and the total amount of the insurance was $1,000, of which $500 was under one of the policies, while each of the other two provided an indemnity of $250. Sixteen days before the death of Mr. Hayward, and when preparations were being made for his removal to a hospital because of his serious illness, he substituted the appellees for his wife, as beneficiaries of the two policies for $250 each, in consideration of their agreement to pay the weekly premiums on all three of the policies on his life and also on a $500 policy of insurance on the life of Mrs. Hayward. The premium payments required each week on the four policies aggregated $1.76. Including the payment of some weekly premiums in arrears, the appellees paid a total of $21.26 on the policies from the time of their designation as beneficiaries under two of them

until the date of Mr. Hayward's death. Immediately after that event they received from the insurance company the sum of $250 under each of those two policies.

In this equity suit the appellant contends that the appellees are entitled to retain only so much of the insurance money paid them as may be needed to reimburse them for the premium payments they advanced, and that they are obligated to pay her the balance of the fund. It is asserted by the appellant that the transfer of the policies to the appellees as beneficiaries was not intended to vest in them an absolute right to the insurance, but was solely for the purpose of affording them security for the repayment of their advancements on account of the premiums. The appellees deny that assertion and claim that the insurance here in question was understood to be vested in them as beneficiaries unconditionally, in consideration of their agreement to pay the premiums on all the policies for the indefinite period during which the insured might continue to live.

If the appellant's contention is well founded, the appellees hold in trust for so much of the insurance fund received by them as may not be required to reimburse them for the premiums they paid, and it is not disputed that such a trust is provable by parol and is enforceable in equity. *Clark v. Callahan,* 105 Md. 600, 614, 66 A. 618; *Price v. Price,* 162 Md. 656, 167 A. 2; *Pope v. Safe Deposit & Trust Co.,* 163 Md. 239, 161 A. 404. The question in the case is therefore one of fact, and its decision, on this appeal from a decree dismissing the bill of complaint, depends upon the result of our study of the conflicting testimony in the record.

The first witness was John R. Griffin, the insurance agent who collected the premiums on the policies and had charge of the change in the beneficiaries. Being asked as to the circumstances under which the change was made, he said: "Mr. Hayward was sick and unable to pay his insurance and I goes to Mr. and Mrs. Campbell on Crittenton Place. I knew previously they had paid his insurance, had volunteered to pay it, and I

asked them, being as he was sick, would they volunteer to pay. They said under one condition providing the beneficiary was changed. If half of the insurance would be changed over to them in order to give them security so in case anything would happen they would not lose. Q. (By the Court) They agreed to keep up the policies if the beneficiary was changed? A. Yes, sir. Q. What further was said about the proceeds of the policies in the event of death? A. They would have some security to get back the premiums that were involved. Q. What were they to do with the difference between the premiums and the face value of the policy? A. Nothing was said about the whole $500; only that they would have some security to get back what they paid in case something should happen. Q. Did you talk to the Campbells by themselves or in the presence of the deceased? A. I talked to the Campbells in their home. Q. Did you ever talk to them in the presence of the insured before he changed the beneficiary? A. No. * * * Q. (By the Court) You said you were there and he was waiting for admission to the hospital. What did he say about changing the beneficiary? A. He was under the impression if he changed the beneficiary Mr. Campbell would give the money over what he paid in back to him. * * * Q. When you say he had this impression did you convey any facts or statement to him from which he got that impression? A. I told him that Mr. and Mrs. Campbell would not sign unless they had some redress of the premiums, that they would be paid back. * * * There were two $250 policies and one $500 all on Mr. Hayward. I changed the two $250 policies. Mr. Campbell paid the premium on the $500 policy. He paid the premium on all the policies, but only two were transferred to him. He also paid premiums on a $500 policy on Mrs. Hayward's life. * * * He agreed to pay the premiums on all four policies but he changed the beneficiary on half of them to have some security so if anything should happen he would get his money back."

Since the death of Mr. Hayward no premiums appear

to have been paid by either of the appellees on the $500 policy on Mrs. Hayward's life.

According to the testimony of Mrs. Hayward, the understanding of herself and her husband was that out of the insurance Mr. Campbell was to "get back" "the money he would pay," and "the rest of the money I would get." Her husband's condition was then "very bad." "He had chronic kidney trouble, skin disease and a bad heart." He was an uncle, by marriage, of the appellees. They had previously helped him with his premium payments.

Mr. Campbell testified: "I met Mr. Griffin at 32nd Street and Crittenton Place. He approached me about the insurance. He said those people were unable to keep up their insurance and wanted to know if I would keep it up for the term of the policy, $500. There was nothing said about me returning any of the money to Mrs. Hayward * * *. We had paid their insurance through Mr. Griffin once before. He said if I would keep the book of insurance the $500 policy would be made over to my wife and myself as beneficiaries. Mr. Hayward and his wife would have nothing to do with it * * *. I agreed to carry all this providing $500 of it was made out to me * * *. He said nothing at all about security. He said it was ours * * *. "(The Court) Q. You got $500 after Mr. Hayward died. How much did you pay out in order to get that $500 insurance? A. Around, I should say, Twenty some Dollars—$21.26. Q. At the time Mr. Griffin met you on the street, did you know that Mr. Hayward was sick? A. I only knew what the insurance man told me * * *. After the policies were turned over to me I went over to my uncle's house twice. This was about a week after I met the insurance man. Q. Was anything said by Mrs. Hayward regarding the insurance policies? A. She only said she was grateful. Q. What if anything did Mr. Hayward say about the insurance policies? A. If we paid the policies for twenty years we would get the full amount and if something happened to him we would get it. Q. What was his condition at that time? A. He was sitting up in a chair.

Q. What did you observe about his condition? A. He was very jolly both evenings I was there. He held conversation in a very sensible manner, I think. Q. Did he say anything to you about the fact that this policy had been transferred as security? A. No, he said it was ours. I was paying on a $500 policy on Mrs. Hayward and $1,000 on my uncle. I paid insurance for my uncle before. I was never paid back. They came over to our home with a gold watch and fountain pen and said they were ours. I said I didn't want them. Our relations were always friendly."

On cross-examination Mr. Campbell testified: Q. The conversations you had before the policies were transferred over to you were all with Mr. Griffin? A. That is right. Mr. Griffin taken care of everything. He told me the whole affair was regular. My uncle had nothing more to do with that policy. Q. You didn't go over to see your uncle before it was signed over to you? A. Yes. Q. You know then that they were waiting to take him to the hospital? A. It was through my wife calling up that he got in the City Hospital. She called up eight days before he died. Q. Did you know he was so sick they were trying to get him in the City Hospital? A. I didn't know that in the first beginning. I found it out when I went over to see him. That was the time I talked to him about the policies. That was the first time I learned they were trying to get him in the City Hospital. Q. Then you knew he was pretty sick and was going to die? A. I didn't know he was going to die, no one knows that. Q. But you knew he was pretty sick? A. Yes. Q. You were satisfied to pay these premiums? A. I did it only to help him out. Q. Did you ever tell him that if he died, you would keep the $500? A. No, I went by what he said. Q. Did you ever tell him what you would do with the $500? A. No."

From the testimony of Mrs. Campbell we quote as follows: "I was one of the beneficiaries under two policies of my uncle's. I first learned I was to be beneficiary around the first part of June, 1937. I went over to visit

the Haywards after I learned this on June 29th. I first saw Mr. Griffin the latter part of June. He came over to collect for the insurance and I didn't have no money. I told him to come later. He did not bring the policies then. I had to borrow the money to pay the insurance from my mother-in-law. It was about $16. Mrs. Hayward came over after the insurance book with the relief man and I gave her the books. They had to have the books in order to get him to the hospital. She took the books home with her. Then she brought them back. I paid the insurance man nine weeks, eight in arrears and one week in advance. Q. What did you do after Mrs. Hayward brought these books back to you? A. I phoned Mr. Griffin and asked him to call, and I would pay him, as my mother-in-law said it would help to get uncle in the hospital if we would pay them right away. Q. Did Mr. Griffin say anything to you at that time or any other time about you being beneficiary? A. He said he would get it all. I said I don't want no funny business or nothing against the law. I wasn't in favor of giving them money in the first place * * *. Q. When you were at the Haywards' home at any time after the policies were transferred to you, was anything said about these policies? A. All uncle said he was grateful for what we did for him and if he lived twenty years we would get it just the same for being so good to him. Otherwise his wife would not get one cent of insurance. He wanted to know that he would be buried properly. It was never my understanding I was to hold the policies for security. The reason we got the policies was for helping him, him being so grateful."

In weighing the testimony in this case we must, of course, give due regard to the fact that the narrative of the appellant and the contradicting statements of the appellees proceeded from witnesses who are directly interested in this litigation. But no such comment is applicable to Mr. Griffin's testimony. While, as agent for the insurance company and individually, he had an interest in keeping the policies in force with a view to the

continued collection of the premiums, there is no reason to suppose that he had any concern whatever in the question as to how the proceeds of the policies, after the death of the insured, should be applied. His relation to the transaction under inquiry was not such as to suggest that he would be partial either to the appellant or to the appellees in the present controversy. With respect to the particular issue of fact in this case he is properly to be regarded as a disinterested witness. It is impossible to reconcile the testimony of the appellees with Mr. Griffin's sworn statement as to the terms and intent of the agreement under which they were substituted as the insurance beneficiaries. But his recital of the agreement is in full accord with the appellant's version. The circumstances of the case are consistent with the testimony of the only disinterested witness, that the transfer of the beneficial interest in the policies was intended only to secure the repayment of premiums to be advanced by the appellees, and not to vest in them an absolute right to the entire fund which the insurance was designed to produce. In our judgment the fact that the transfer was made under such an agreement should be accepted as sufficiently proved.

The bill of complaint included a charge of fraud and undue influence which the evidence failed to sustain. But the proof justifies a conclusion that the appellant is entitled to a decree for an accounting as to the insurance money to which the bill refers, and for the payment to the appellant by the appellees of the fund received by them in excess of the premiums which they paid to keep the insurance in force.

*Decree reversed, with costs, and cause remanded for the passage of a decree in conformity with this opinion.*