**NATIONAL LIFE INSURANCE COM- PANY, Plaintiff,**

v.

**Naomi Bauer TOWER**

and

**Maryland National Bank, Trustee, Defendants.**

**Civ. A. No. 15723.**

United States District Court
D. Maryland.

March 9, 1966.

William O. Doub and Hilary W. Gans, Baltimore, Md., for plaintiff.

John H. Hessey, Mahlon W. Hessey, and Hessey & Hessey, Baltimore, Md., for defendant Naomi Bauer Tower.

Walter E. Black, Jr., Baltimore, Md., Daniel H. Honemann, and F. DeSales Mudd, LaPlata, Md., for Maryland National Bank, trustee.

WINTER, District Judge:

National Life Insurance Company (National) has impleaded Mrs. Naomi N. Bauer (Widow) and Maryland National Bank, Trustee (Trustee), and has paid into the Registry of the Court the sum of $11,500.00, being the proceeds of a life insurance policy on the life of Creston H. Bauer, deceased, who died January 31, 1964. The impleaded defendants dispute the question of whether the Widow, the named beneficiary, is entitled to all or any part of the proceeds of the insurance policy, or whether the Trustee, who was trustee under a pension plan pursuant to which the policy was issued and owner of the policy, is entitled thereto.

Except for brief testimony from a member of the Pension Plan Committee created under the pension plan, who was also an officer of deceased's employer, the insurance consultant employed by the Pension Committee, and an officer of the Trustee, all essential facts have been stipulated. Since the facts are not in dispute, only such as are immediately pertinent to the issue to be decided will be stated.

Deceased was employed by Parlett Gas Company, a Maryland corporation, subsequently known as Pargas, Inc. (Parlett), which established a pension plan for its employees by executing a trust agreement on December 29, 1953. The trust agreement was restated in its entirety, with amendments, December 28, 1962. The pension plan provided both retirement benefits and death benefits for participants. The plan was funded in part by assets consisting of securities and cash, administered by the Trustee under the plan, and in part by life insurance. As to the latter, the Trustee serviced the policies but did so under the instructions of the Pension Plan Committee, a group established under the trust agreement, and the Pension Plan Committee in turn employed, and relied on the advice of, an insurance consultant.

Deceased was employed by Parlett on January 27, 1954 and was a participant in the pension plan under the terms of

the trust agreement. Deceased made no contribution to the trust fund created by the trust agreement as such. The cost of insuring his life to provide for the death benefit to which he was entitled under the pension plan was contributed by Parlett, but Parlett reported on deceased's federal income tax withholding statements as gross income to deceased a sum equivalent to the net cost of such life insurance protection.

Deceased died on January 31, 1964. Under the terms of the trust agreement, his designated beneficiary was entitled to a death benefit equal to deceased's final average compensation for the last five years of his employment. This benefit would have amounted to $8,000.00. However, deceased's average final compensation for the last five years of his employment was less than the average for the five best years of his employment, so the Pension Committee, which was vested with authority to make such decisions under the trust agreement, determined that he was entitled to a death benefit of $11,500.00. Trustee held three life insurance policies of Continental American Life Insurance Company (Continental), having an aggregate face value of $11,500.00, to satisfy the obligations of the trust. All of these policies showed the Trustee as the owner of the policy, and all of them had Widow as primary beneficiary.

Late in 1963, the insurance consultant and adviser to the Pension Committee recommended a change of insurance company from Continental to National, for the purpose of reducing the cost of insurance coverage, and the Pension Committee accepted this recommendation. Continental's policy on the lives of participants in the pension plan expired December 28, 1963, while National's policies, being purchased to replace them, were effective January 1, 1964. In order to insure continuous coverage, the insurance consultant recommended that Continental's policies not be surrendered for their cash surrender values until the expiration of the grace period for payment of premiums, i. e., January 27, 1964.

In fact, the Pension Committee did not direct the Trustee to cancel Continental's policies until February 3, 1964, and, meanwhile, the death of deceased had occurred. The cash surrender value of Continental's policies on the life of deceased on February 10, 1964, when the Trustee forwarded all Continental policies, except those on the life of deceased, to Continental for surrender was $2,337.-23, and had the policies been canceled prior to deceased's death Trustee would have been entitled, as owner of the policies, to that amount.

The insurance consultant, the Pension Committee and the Trustee overlooked the fact that Continental's policies contained a provision relating to automatic premium loans. Although no loan charges were ever invoked against the proceeds of the policies, the policies remained in effect after the expiration of the grace period, and Widow, with the acquiescence of the Pension Committee and the Trustee, filed a claim of benefits and received the proceeds of Continental's policies, in the amount of $11,500.00.

While Continental's policies thus remained effective after December 28, 1963, the Pension Committee, on recommendation of the insurance consultant, sought and obtained a policy from National on the life of deceased, in the amount of $11,500.00, and such policy was issued as of January 1, 1964, showing the Trustee as owner and Widow as primary beneficiary. On January 29, 1964, the Pension Committee advised the Trustee that the premium on National's policy had been paid.

When the fact became known that the life of deceased was insured by both Continental and National, the Pension Committee determined that Widow was not entitled to the proceeds of National's policy, she having theretofore received the benefits of Continental's policies. Pursuant to the instructions of the Pension Committee, the Trustee filed a claim with National on behalf of the trust fund on June 5, 1964. Widow also filed a claim with National for the proceeds of its policy, and this interpleader resulted.

■ The policies of Continental and National were both issued in accordance with the terms and provisions of the pension plan to fund the death benefit provided under that plan. In such circumstances, the trust agreement establishing the pension plan is the superior document, and it is to it that the Court must look to determine the rights and obligations of the parties. Shore v. Bell Telephone Company, 389 Pa. 445, 133 A. 2d 157 (1957); Hurd v. Illinois Bell Telephone Co., 136 F.Supp. 125 (N.D.Ill. 1955), aff'd, 234 F.2d 942 (7 Cir. 1956).

Deceased's rights under the pension plan were limited to a death benefit in the amount of $8,000.00. The Pension Committee, however, did have the authority, and exercised its authority, to fix his death benefit at $11,500.00 by using as the measure of the benefit his average annual compensation for his best five years, rather than his average annual compensation for the last five years, of his employment.

The terms and provisions of the pension plan are unexceptional for pension plans designed to qualify under 26 U.S. C.A. §§ 401–404. The pension plan established retirement benefits for employees of Parlett, and it provided an incidental death benefit, Treasury Regulation, § 1.401(b) (1) (i); Rev.Rul. 61–157, 1961–2 Cum.Bull. 67; Rev.Rul. 61–121, 1961–2 Cum.Bull. 65. To provide for retirement payments, and to provide for insurance to meet death benefits when payable, Parlett alone undertook the obligation of making annual contributions to the Trustee in such amounts " * * * as may be necessary to provide the benefits under the Plan for its respective employees, and such other sums as may be necessary to defray the other expenses of administration of the Trust Fund * * *," although the income tax laws of the United States required that it treat as gross income to employees the amount of its contributions attributable to payment of premiums on life insurance policies on the lives of its employees and withhold federal income tax thereon. A trust fund was created under the plan, and amounts contributed by Parlett were authorized to be invested and reinvested and the income derived therefrom applied both in payment of benefits granted under the plan and in diminution of the amounts required to be contributed by Parlett annually to keep the plan actuarially sound. The plan specifically provided that dividends on life insurance policies purchased to fund the death benefits provided for under the plan should be received by the Trustee and applied to the payment of the current or next succeeding premium, although the plan did state " * * * upon the maturity of a contract by the death or retirement of a Participant all accrued or post mortem dividends * * * shall be considered as part of the proceeds of such contract payable to the Participant or his Beneficiary."

In addition to the overall scheme that an employee would be entitled only to the benefits established by the plan, payment for which was the sole responsibility of Parlett, the plan created the Pension Committee and gave it powers of administration, including " * * * the power to interpret and construe this Agreement, to determine all questions of eligibility and the status and rights of Participants, Beneficiaries, and other persons hereunder, * * * to provide the benefits contemplated by the Plan, to authorize withdrawals from the Trust Fund, and to determine all actions to be taken in accordance with the terms of this Agreement." By other appropriate language, it was provided that any action taken or decision made by the committee in good faith " * * * shall be final and conclusive and binding as to all parties to this Agreement, including the Participants, their Beneficiaries, and the Trustees * * *." By its terms, the trust agreement negatived the assertion of any legal or equitable right against any of the employer, the trustee, pension plan committee, a participant, or beneficiary against another " * * * unless the same is specifically provided for herein * * *" and, generally, the trust agreement stated that it was bind-

ing upon the beneficiaries, heirs, executors, administrators and assigns of employees, as well as the successor and assigns of Parlett and the Trustee.

In the light of these provisions and the action of the Pension Committee determining that Widow was entitled to an $11,500.00 death benefit, rather than $8,000.00, the case resolves itself to a determination of who is entitled to the $11,500.00 proceeds of National's policy, the deceased and the prime beneficiary he designated having received all that they were entitled to under the provisions of the trust agreement. The answer is found in the law of constructive trusts, particularly as that law has been developed and applied in Maryland, since the parties, through their counsel, agree that the law of Maryland is controlling, and the trust agreement states that that instrument is to be construed according to the law of Maryland.

The classic definition of a constructive trust is that formulated by Mr. Justice Cardozo in Beatty v. Guggenheim Exploration Co., 225 N.Y. 380, 386, 122 N.E. 378, 380 (1919), where he said:

"A constructive trust is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee."

To like effect is the definition in 4 Scott, Trusts § 462 (2d. Ed. 1956), and Restatement, Restitution § 160 (1937).

A relatively late description of a constructive trust is contained in Carter v. Abramo, 201 Md. 339, 343, 93 A.2d 546, 548 (1953), where it is said:

"A constructive trust is imposed where a person holding title to property is subject to an equitable duty to convey it to another person on the ground that he would be unjustly enriched if he were permitted to retain it. The duty to convey the property may arise because it was acquired through fraud, duress, undue influence, or mistake, or through a breach of fiduciary duty, or through wrongful disposition of another's property."

See also, Fasman v. Pottashnick, 188 Md. 105, 51 A.2d 664 (1947). From this quotation it appears that in Maryland a constructive trust may be imposed where the property was acquired through mistake. Two of the leading text authorities on the subject recognize that mistake alone may be a sufficient basis on which a constructive trust may arise, 4 Scott, supra, § 462.2; Bogert, Trusts and Trustees § 474 (2d. Ed. 1960).

The quotation also recognizes that constructive trusts usually arise because of fraud, duress, undue influence or breach of fiduciary duty, in short, as a result of some form of wrongful conduct. Professor Scott, however, in the last cited reference to his text on Trusts, states that a constructive trust may arise solely from unjust enrichment without even the necessity of showing mistake.

Maryland also recognizes the last stated rule. In Hayward v. Campbell, 174 Md. 540, 199 A. 530 (1938), a constructive trust was imposed on the beneficiary of life insurance policies even though the Court specifically found that no fraud or undue influence was involved. See also, Springer v. Springer, 144 Md. 465, 125 A. 162 (1924). In O'Connor v. Estevez, 182 Md. 541, 555, 35 A.2d 148, 155 (1943), the Court stated as a general rule that constructive trusts are " * * * declared to exist where property has been acquired by fraud or some other improper method, or where the circumstances render it inequitable for the party holding the title to retain it." In that case a constructive trust was imposed, again where the Court found that neither fraud nor constructive fraud were found to exist.

The holding and language of O'Connor v. Estevez were considered in Dove v. White, 211 Md. 228, 126 A.2d 835 (1956), where earlier Maryland decisions were reviewed and compared to English law. Judge Hammond, writing for the Court,

in a case in which a constructive trust was sought to be imposed upon land, indicated that under the English rule a constructive trust would be imposed on the grounds of fraud *or* unjust enrichment, while generally in the United States a constructive trust would be imposed on land on grounds of fraud, wrongful conduct, breach of confidential relationship, or if the transfer was made as security. In short, the general rule in the United States in such a case is that unjust enrichment alone is not a sufficient basis to impose a constructive trust. Following this statement, Judge Hammond said: "Maryland has seen the true rule to be even broader than the English rule for this Court has held, as the sole basis for decision, that a constructive trust arises under any circumstances which render it inequitable for the holder of the legal title to retain it," citing O'Connor v. Estevez, supra. Id. at 232, 126 A.2d at 837. Later in the opinion, Judge Hammond stated the recognition of the Court that, in the *O'Connor* case, supra, " * * * the Court found no fraud or constructive fraud and made no finding, or indeed mention of confidential relations, but held that a constructive trust arose because the facts and circumstances showed a situation such as to ' * * * render it inequitable for the party holding the title to retain it.' " Id. at 233, 126 A.2d at 837.

Based on these authorities, the Court concludes in the case at bar that there are two separate and independent grounds on which a constructive trust should be imposed on the proceeds of National's policy in favor of the Trustee. The undisputed facts show that the life of the deceased was insured under Continental's and National's policies out of an abundance of caution, to make sure that the deceased was fully protected during the transition from one insurer to another, but that this caution, coupled with the mistake of the insurance consultant and the Pension Plan Committee that Continental's policy would expire January 27, 1964 resulted in double coverage on the date of death, January 31,

1964. Thus, mistake as a grounds for constructive trust is present. The evidence goes further because it also shows that Widow has received everything for which deceased indirectly paid and everything to which deceased was entitled under the trust agreement. Broadly considered, the Trustee, under the trust agreement, is entitled to all increments on and income from the trust estate and no part thereof may inure to the benefit of Parlett. The only exception to this basic concept is that post mortem dividends on insurance policies benefit the beneficiaries, rather than the Trustee. To permit Widow, after having received all that she is legally or equitably entitled to, to deprive Trustee of that to which it has an equitable right would constitute unjust enrichment to her and, thus, there is a second basis on which to impose a constructive trust on the $11,500.00 proceeds from National's policy in favor of Trustee.

The arguments made on behalf of Widow to support a contrary result are not convincing. Technically, it is true that the constructive trust should be imposed on the proceeds of Continental's policy, since the evidence shows that National's policy was intended to fund deceased's death benefit, rather than that of Continental. The evidence does not show that by permitting Widow to collect the proceeds of Continental's policy the Pension Plan Committee or the Trustee intended that she should receive both, or intended to relinquish Trustee's claim to one-half of double coverage. Both policies have resulted in a payment of $11,500.00 each and, since money is fungible, it makes no difference under which policy Widow has collected. Stated otherwise, on the maxim that "equity regards as done that which should be done," Widow can be deemed to have been paid by National and to have refunded that which she was paid by Continental.

█ Widow's argument that to give effect to Trustee's ownership of a second policy on the life of deceased during the time that both policies were in effect would be impermissible because Parlett's

insurable interest in deceased did not exceed $11,500.00 is lacking in merit. It is true that at the time of the procurement of life insurance the beneficiary must have an insurable interest in the insured, and that there cannot be gross disproportion between the value of the interest protected and the amount of coverage or the insurance contract will be deemed against public policy as a wagering contract. See, 5 Ann.Code of Md., Art. 48A, § 366 (1957); Rittler v. Smith, Adm'x., 70 Md. 261, 16 A. 890, 2 L.R.A. 844 (1889); Cammack v. Lewis, 15 Wall. 643, 82 U.S. 643, 21 L.Ed. 244 (1873); Urquhart v. Alexander & Alexander, Inc., 218 Md. 405, 412–413, 147 A.2d 213 (1958). Continental, however, has paid the face amount of its policy, and National has paid the face amount of its policy into the Registry of the Court. Hence, neither has asserted that the Trustee lacked an insurable interest, and the defense of lack of insurable interest, under Maryland law, is one available only to the insurer. First Nat. Bank of Cumberland v. Thomas, 151 Md. 241, 134 A. 210, 47 A.L.R. 730 (1926); Clogg v. McDaniel, 89 Md. 416, 43 A. 795 (1899); Robinson, Adm'r. v. Hurst, 78 Md. 59, 26 A. 956, 20 L.R.A. 761 (1893); Hewlett v. Home for Incurables, 74 Md. 350, 24 A. 324, 17 L.R.A. 447 (1891). See also, Bynum v. Prudential Ins. Co., 77 F.Supp. 56 (E.D.S.C.1948); Travelers' Ins. Co. v. Morris, 115 N.J.Eq. 142, 169 A. 835 (1934).

Finally, the Widow argues that any constructive trust imposed on the funds in the Registry of the Court in favor of Trustee should be limited in amount to $2,337.23, the sum which the Trustee would have realized had Continental's policy been canceled after National's policy became effective and before deceased died. The answer to this contention is that when the terms of the pension plan are examined, Widow has no greater right to the excess over $2,-337.23 than the sum of $2,337.23. The pension plan gives her no legal or equitable rights other than those specifically granted therein. The excess over $2,337.-

23 is not an "accrued or post mortem dividend[s]." It is the balance of the face amount of the policy. Widow, by having received $11,500.00, has obtained everything to which she is entitled, and the accident that the face amount of the policy is being paid should be a benefit for the owner of the policy who is obligated to devote the proceeds to providing retirement and death benefits for other employees of Parlett who are entitled to the same under the pension plan. It was against the Trustee's funds that the premiums on the extra life insurance policy were chargeable and no portion of these premiums was either chargeable or taxable to the deceased after the expiration of the grace period on the Continental policy.

Counsel may agree upon an order in accordance with the views expressed herein.