# SARAH ALWOOD

*v.*

# HENRY MANSFIELD *et al.*

1. MORTGAGE—*of a deed absolute in form.* In this case it is held, upon the facts, that a deed, absolute in form, was intended by the parties to have effect accordingly, and that the transaction showed nothing of the character of a loan, or of the relation of debtor and creditor.

2. ATTORNEY AND CLIENT—*of dealings between them—and herein, where a third person intervenes in the transaction.* A decree having been rendered declaring a right of redemption of certain premises, and the time fixed for the payment of the money having nearly elapsed, one of the parties in interest, who had sought the redemption, agreed with a third person to sell to him a portion of the land, as a means of getting the money with which to redeem the whole. The proposed purchaser suggested as a mode of getting the title, that the owners of the land should convey to their solicitor who had obtained the decree of redemption for them, and the solicitor then convey to the purchaser, the latter to assume the payment of the solicitor's fee for obtaining the decree, and which was contingent upon the redemption being accomplished. The matter was consummated in this mode. The land was sold for greatly less than its value, but it did not appear the party in interest who negotiated the sale was deceived by any matters between the purchaser and the solicitor, or that the latter exercised any undue influence over him. It was *held*, that while the transaction would have been impeachable, at the instance of the party who sought to obtain the means for redemption by a sale, if it had been between him and his solicitor, in its principal features, yet, upon the facts, it was regarded as a transaction, not with the solicitor, but with the purchaser, and the party who thus sought the arrangement could not invoke the rule governing the relation of attorney and client as a ground for avoiding the contract.

3. But the other parties in interest who joined in the deed to the solicitor, were differently situated. They were two sisters of the party who negotiated the sale, and had no knowledge of the real character of the transaction. On making the agreement, the solicitor prepared a deed for the whole of the land from his clients to himself, and sent it by his own agent to these two sisters to be executed by them, the solicitor's agent assuring them that the purpose of the deed was simply to enable the solicitor to obtain a loan on the land with which to redeem under the decree; and, on being questioned on the subject, the agent further assured them that the solicitor was a perfectly honest man and would give them a bond showing the character of the transaction, but that the deed must be made at once, as the time for redemption was about to expire. On these assurances the deed was executed, and on its return to the solicitor he at once conveyed to the purchaser the part originally agreed upon, at a price greatly below its value, the purchaser assuming the payment of the solicitor's contingent fee, and the proceeds of the sale were applied in redemption under the decree. The grantee of the solicitor knew of the fiduciary relation existing between his grantor and his clients, and was a direct party to the act of procuring the deed to the solicitor in the way it was done. It was *held*, the solicitor violated his obligation to his clients in deceiving them as to the purpose of the deed to him, and in attempting to sacrifice their land merely to secure his own fee. And his grantee, who participated in the fraudulent transaction, stood in no better attitude. So it was held such grantee should be deemed a trustee, by virtue of a constructive trust, in respect to that portion of the land belonging to those who had thus been betrayed by their solicitor.

4. The principles which govern the cases of dealings of persons standing in a fiduciary relation, apply to persons who clothe themselves with a character which brings them within the range of the principle; or, who take instruments, securities or moneys, with notice that they have been obtained by a person filling a position of a fiduciary character, from a person towards whom he stood in such relation.

5. And there is no distinction, in the application of those principles, between the case of one who himself exercises a direct influence, or of another who makes himself a party with the person who exercises the undue influence.

6. SAME—*of the burden of proof.* Where a third person was a party with a solicitor in a transaction with clients of the latter, and seeks to hold property thus secured, the burden is upon him, as it would have been upon the solicitor, to show that the transaction was in all respects just and fair.

7. A PURCHASER *pendente lite* will hold in subservience to the rights of the parties as finally determined in the pending litigation.

APPEAL from the Circuit Court of Sangamon county.

32—59TH ILL.

This was a suit in equity, instituted by Sarah Alwood, appellant, against Henry Mansfield and others, appellees, in the Mason circuit court, from which it was transferred to the Sangamon circuit court, where it was tried upon the pleadings and proofs, and the bill dismissed.

The principal facts established by the pleadings and evidence, are, that in the year 1856, one Andrew J. Alwood died intestate and seized in fee of certain lands, described in the bill, amounting to 1440 acres, but which lands were subject to a deed from said Alwood to one Elisha Ruckman. The deed was absolute upon its face, but was in fact given as security for the loan of $1600 by Ruckman to said A. J. Alwood, and was intended as a mortgage only, but that, after the decease of said Alwood, Ruckman claimed an absolute title to the lands; that said A. J. Alwood died without issue, leaving the complainants, Sarah Alwood, Esther A. Phillips and Hugh M. Alwood, his brother and sisters, and Benjamin Alwood, his father, his only heirs at law; that by reason of Ruckman's said claim, it became necessary to institute a suit in equity against him to have said deed declared a mortgage, and to allow the parties interested to redeem, and for that purpose the heirs at law of A. J. Alwood, deceased, employed Manning & Merriman, attorneys at law, practicing as co-partners in Peoria, to commence and conduct the suit to its final termination, agreeing to pay them an absolute fee of $200, and a further fee of $3000 contingent upon the success of the litigation. To secure the contingent fee, Hugh M. Alwood executed to Manning & Merriman his mortgage deed upon the lands in question in that litigation; that the suit was instituted, and such proceedings had therein that, in the summer of 1861, a decree was made declaring said deed to Ruckman to have been a mortgage, and giving the heirs of A. J. Alwood the right to redeem by paying to Ruckman the sum of $2000 by the 15th of November, 1861.

It appears that in February, 1861, Benjamin Alwood, the father, died intestate, leaving Sarah and Hugh M. Alwood and Esther A. Phillips his only heirs at law.

It appears that up to near the time for the payment of the $2000, under the decree against Ruckman, the parties complainant in that suit had relied upon their solicitors, Manning & Merriman, to raise the amount by security upon the land, but they having failed, and the parties themselves being unable to do so, about the 13th of November, 1861, application was made by Hugh M. Alwood to Mansfield, the defendant, to loan the amount required, and take security on the land. This he refused to do, but expressed a willingness to pay the $2000 on a purchase of 1000 acres of the 1440 acres.

After considerable negotiation between Mansfield and Manning & Merriman, it was proposed by Mansfield that, if Manning would procure a deed from his clients to himself, and Manning & Merriman would release their mortgage, he would advance the $2000 and take an absolute conveyance from Manning. This arrangement was made in Manning's office, in Peoria, in the absence of both Sarah Alwood and Esther A. Phillips, both of whom resided on the land thus proposed to be conveyed to Mansfield. But Hugh M. Alwood was present and participated in the arrangement, to carry which into effect, one C. P. Taggart, a young lawyer who was occupying Manning's office, was furnished by Merriman with a deed prepared by the latter, for the whole 1440 acres, to be executed to Manning by the Alwoods and Mrs. Phillips. Being furnished with this deed, he was sent by Merriman to Mason county, where Sarah Alwood and Mrs. Phillips were residing upon the land, to get it executed by them, Merriman guaranteeing him his pay for going, and Mansfield, having notice of his mission, employed him to investigate the title and see if it was good in the Alwoods. He went, and Hugh M. Alwood accompanied him.

It appears from the evidence that Taggart represented himself to Mrs. Phillips, who appears to have acted for her sister, as Manning's agent, and both Taggart and Hugh M. Alwood represented to her that the deed to Manning, which these

females were requested to execute, was simply for the purpose of enabling Manning to borrow money in order to comply with the Ruckman decree, Taggart saying that he understood that, unless the deed was made in time for him to get back to Peoria by the next morning, the land would be lost, or it would be too late to comply with the decree; that Mrs. Phillips inquired of Taggart what kind of a man Mr. Manning was, and he assured her that he was perfectly honest. She asked for a bond back, but was told that, although they had none prepared, yet Mr. Manning would give back a bond. Upon these assurances, the deed was executed, and immediately placed upon record by Taggart, who also investigated the title and found it good in the Alwoods, and free of incumbrance, except the mortgage to Manning & Merriman. Upon returning to Peoria, he first reported the results of his mission to Merriman, and next to Mansfield, and the state of the title. Nothing was paid or agreed to be paid by Manning, or any person for him, to Mrs. Phillips or Sarah Alwood, for the conveyance, nor was any intimation made of the arrangement to sell absolutely to Mansfield. Nor had Hugh M. Alwood any authority to make any such sale.

Upon obtaining the deed in this manner, Manning & Merriman carried the arrangement with Mansfield into effect by Manning executing to him an absolute deed for the 1000 acres, and Mansfield paying the $2000 to the clerk of the circuit court in discharge of the Ruckman decree; Manning & Merriman releasing their mortgage executed by Hugh M. Alwood, but taking Mansfield's agreement to pay them the amount of it out of the proceeds of the lands.

It appears that the lands conveyed to Mansfield by Manning were worth at that time from $15,000 to $20,000, and that they have since greatly advanced in value; that they lie in a body, and were very good land; that Manning afterwards conveyed back to his clients 440 acres of the lands, but which were of a poorer quality, and worth only about $3000.

It was made a condition of the transaction that Hugh M. Alwood should take from Mansfield a lease of all that portion of the 1000 acres which was under cultivation.

It also appears that Mansfield was fully aware, at the time, of the relation of solicitor and client existing between Manning & Merriman, the Alwoods and Mrs. Phillips, and of the existence of the mortgage from Hugh to his solicitors.

It also appears that, in September, 1864, Hugh M. Alwood and Esther A. Phillips conveyed all their interest in the lands to the complainant.

Mr. H. E. DUMMER, Messrs. LACEY & WALLACE, and Mr. S. P. SHOPE, for the appellant.

Messrs. HAY, GREENE & LITTLER, and Mr. B. S. PRETTY-MAN, for the appellees.

Mr. JUSTICE McALLISTER delivered the opinion of the Court:

It has been strenuously insisted by counsel for appellant, that the conveyance to Mansfield, although absolute in form, was, nevertheless, but a security for a loan, and should, therefore, be declared a mortgage, and appellant, who has succeeded to all the rights of her co-tenants in the lands, be permitted to redeem.

This case has been twice considered by the court, and much care and deliberation given to it. It is the opinion of all the members of the court, that the arrangement between Manning & Merriman, Hugh M. Alwood and Mansfield, under which both the deed to Manning, by his clients, and from him to Mansfield, were made, contemplated, as between these immediate parties, an absolute sale to Mansfield of the 1000 acres of land conveyed to him. The transaction shows nothing of the character of a loan, or of the relation of debtor and creditor. The weight of the evidence is almost wholly in favor of an absolute sale, and will justify no other conclusion.

The next question in the natural order of this case is, whether, under the evidence, the transaction is impeachable, so far as relates to the interest of Hugh M. Alwood. It is the opinion of a majority of the court that it is not. If it had been between him and his solicitors, in its principal features, the case would have been different. But his position is this: He first applied to Mansfield for a loan. The latter expressly refused to make any loan on the land, but suggested a willingness to purchase and pay for a portion of the land. The unwillingness of Mansfield to make a loan, or rather his determination not to, must have been understood by Hugh M. Alwood, if he was a sane man. Then Mansfield proposed that if Manning would obtain a deed from Hugh and his sisters, he would purchase the 1000 acres, and pay the amount of the Ruckman decree. Hugh M. Alwood assented to this. Here he was dealing with Mansfield, between whom and himself no confidential relation existed. If he was deceived by any matters between Mansfield and Manning & Merriman, or if the latter exercised any undue influence over him, the case does not show it. The case, so far as he is concerned, was, from the beginning and throughout, based upon the ground, that the transaction was of the character of a loan and security, and not an absolute purchase. The entire weight of the evidence is against this theory, and so far as the evidence discloses, there is not only no basis for the position, but explicit and extraordinary pains were taken at every step of the business to have him understand that it was not a loan and security, but an absolute sale.

A man has no right to wilfully and perversely shut his eyes against the real nature of a transaction, and then, without proof of deception and fraud, ask a court of equity to give him relief on the ground that he understood it differently from what it was.

If he was deceived by his solicitors, he has failed to show it. The emergency was great and pressing, we admit, but in every other respect he and Mansfield dealt at arm's length.

There was no confidential relation between them. He was privy to the entire arrangement for Manning to obtain the deed from his sisters, and convey absolutely to Mansfield. He could not have misunderstood it, and is guilty of the unpardonable conduct of going with Taggart to his sisters and representing to them that the deed to Manning was only to enable the latter to borrow money to pay off the Ruckman decree, when he must have known, if sane, that the purpose of it was to make an absolute sale of 1000 acres of the best of the lands for a sum merely sufficient to discharge that decree.

But it is the opinion of a majority of the court, that the case, as respects the interest of Sarah Alwood and Esther A. Phillips, stands upon an entirely different footing. At the time they executed the deed to Manning, he and Merriman were their solicitors in a suit involving these very lands. Taggart came to them with a deed which had been prepared by Merriman, representing himself as the agent of Manning, requesting them to execute it. He told them that the object of the deed was to enable Manning to use the lands as security in raising the sum requisite to comply with the Ruckman decree, the time for which had, as they knew, nearly expired. He said that he understood that, unless the deed was made in time for him to go back to Peoria by the next morning, the land would be lost, or it would be too late to comply with the decree. Mrs. Phillips asked him what kind of a man Mr. Manning was. Taggart assured her he was a perfectly honest man, and would do as Hugh requested. She wanted a bond from Manning for their protection. Taggart assured her that it should be all right. Under these circumstances, without any intimation as to the arrangement already made, to sell 1000 acres of these lands absolutely to Mansfield, and acting under the belief created by the representations made to them, that the purpose of the deed was to enable Manning to use the lands as security to raise money with which to comply with the Ruckman decree, and without consideration, these two

females, the clients of Manning & Merriman, executed this deed to one of their solicitors.

The rules of law, relative to the duties of solicitors, are quite familiar. It is the duty of the solicitor to protect the interest of his client. The client is entitled to the full benefit of the best exertions of his solicitor ; and the solicitor may not bring his own personal interest, in any way, into conflict with that which his duty requires him to do on behalf of his client.

Manning & Merriman had a special and pecuniary interest in having the Ruckman decree complied with, for without such compliance their mortgage was worthless. This interest was the motive, on their part, for the arrangement with Mansfield.

Although by it they were to release their mortgage on the land, yet they were to have an agreement for its payment out of the proceeds of the land. When, by this arrangement, 1000 acres of the best of these lands were to be sacrificed as to their clients—a sacrifice of $10,000, at least, for the sake of securing their mortgage for $3000—is it not manifest that they thereby brought their own interest into direct conflict with their duty to their clients?

Their clients were a brother and two sisters, who were tenants in common of the lands. Their duty was to each individually. If they saw that the brother was willing to join with them in a scheme to sacrifice the interests of his sisters, was it any palliation of the wrong on their part, that they were enabled to superadd to their own influence, growing out of the relation of solicitors and confidential advisers, that of a brother who had a similar dominion over the minds of these unprotected females?

Not by any means. If these solicitors discovered that the brother was willing to lend his influence to the attempt to obtain this deed, it was their duty to intervene, apprise their clients and prevent the contemplated wrong, as readily as if he had been a stranger, instead of a brother. When, therefore, Merriman put into Taggart's hands the deed to be executed,

which was to cut off these female clients forever from the lands bargained to Mansfield, it was his duty to inform Taggart, if he was not already informed, of the proposed absolute sale, and require him to fully disclose it to these clients before they were asked to execute the deed.

If Merriman had obtained the execution of the deed in person, could there have been any doubt of his duty to make a full disclosure? And will it be tolerated that an attorney or solicitor may avoid that duty and obtain the conveyance of valuable property from clients without consideration, by sending a clerk instead of going in person?

But, it is said that Taggart was the mere agent of Hugh M. Alwood.

It is venturing rather too far upon the credulity of the court to take that position in the face of the testimony in this case, which, from its very nature, calls for the severest scrutiny of a court of equity. It is not an uncommon artifice, in cases of overreaching and fraud, to so manage the transaction that the instrument, through whom the fraud is perpetrated, shall appear to be the agent either of the victim, or of some person other than the one who reaps the benefit of the fraud. It is true that Mansfield told Taggart that he would not pay him for going, but if he did go, he wanted him to investigate the title and see if it was good in the Alwoods. It was so managed that Hugh should first speak to Taggart about going. Still Merriman prepared the deed for his clients to execute, directed him to get it done, and at the same time guaranteed him his pay for going. Taggart was, at that time occupying Manning's office, and it appears, though rather obscurely, that he had studied law with Manning & Merriman, and was very familiar with the Ruckman litigation. He testifies himself, that he understood, at the time he went, that Manning & Merriman had a mortgage for $3000, their fees in the Ruckman case, and that if the decree was not complied with by the 15th of November, 1861, they would lose their fee. And

when he saw the women, he, as several witnesses testify, represented himself as Manning's agent. Then, when he returned, to whom did he report the result of his mission? To Hugh M. Alwood? By no means. He first accounted for his agency to Merriman, who gave him the deed to get executed, informing him that it was executed and placed upon record. He then reports to Mansfield that he had investigated the title, found it good in the Alwoods and free from incumbrance, except the mortgage to Manning & Merriman.

The only remaining question is, whether Mansfield is so far affixed with notice as to place him in the position of Manning, in respect to the acquisition of the deed to the latter. The evidence shows, most conclusively, that he knew of the existence of the relation of solicitors and clients between Manning & Merriman, and Sarah Alwood and Mrs. Phillips; that he knew of the existence of the mortgage Manning & Merriman held, and its origin. Knowing these facts, and the pressure of circumstances under which the Alwoods were placed in regard to the Ruckman decree, Mansfield was the one who proposed that Manning should obtain from his clients the deed which was to enable the former to obtain a title to this land for less than a third of its actual value, and Manning & Merriman to secure their $3000 without further trouble. He knew that a purchase by Manning was not contemplated, and that the only means of obtaining the deed was through the confidential relation subsisting. He was a direct party to the act of sending Taggart to obtain the deed in this way.

" The principles," says an excellent author, " which govern the cases of dealings of persons standing in a fiduciary relation, apply to persons who clothe themselves with a character which brings them within the range of the principle; or, who take instruments, securities or moneys, with notice that they have been obtained by a person filling a position of a fiduciary character, from a person towards whom he stands in such relation." Bump's Kerr on Frauds, 152, and cases in note 4.

And again, on page 194, the same author says: " In the application of the principles of the court, there is no distinction between the case of one who himself exercises a direct influence, or of another who makes himself a party with the person who exercises the undue influence."

Mansfield, by making himself a party with Manning & Merriman, who filled the position of a fiduciary character towards those from whom the deed was obtained, was just as much bound to show, to the satisfaction of the court, that the parties to the deed were, notwithstanding the relation, substantially at arms' length and on an equal footing, and that nothing had happened which might not have happened had no such relation existed, as Manning would have been, if the controversy were between him and his clients. The burden was upon him, under the circumstances of this case, as it would have been upon the solicitors themselves if they had attempted to hold the lands to the exclusion of the rights of their clients, to show that the transaction was in all respects just and fair. Instead of assuming that burden and making the proof required by an inflexible rule of public policy, none is attempted, and the evidence stands uncontradicted that the deed was obtained by concealment, misrepresentation and contrivance.

" Whenever the circumstances of a transaction are such that the person who takes the legal estate in property, can not also enjoy the beneficial interest, without necessarily violating some established principle of equity, the court will immediately raise a constructive trust and fasten it upon the conscience of the legal owner, so as to convert him into a trustee for the parties, who, in equity, are entitled to the beneficial enjoyment." Hill on Trustees, 144.

It is the opinion of a majority of the court, upon the whole case, that Mansfield should be declared a trustee for complainant, by virtue of a constructive trust, as respects and to the extent of all that portion of the land conveyed to him by Manning, which belonged to complainant and Esther A.

Phillips, as heirs at law of A. J. and Benjamin Alwood; that upon an account being taken and stated by the master, in accordance with the rules and practice of equity in cases between trustee and *cestui que trust*, of the whole amount paid by Mansfield, to apply on the Ruckman decree, and all moneys expended by him in payment of taxes legally levied, or for necessary repairs upon the premises, with legal interest, and deducting therefrom all that he may have received as the rents, issues and profits of the land; then from the balance, if any there be, thus chargeable upon the whole lands, an amount should be ascertained bearing the same proportion to the whole sum, so chargeable upon the lands, as the portion and share of complainant and Esther A. Phillips therein, as such heirs at law, shall bear to the whole lands conveyed. This proportionate sum should be required to be paid by complainant in ninety days from the entry of the decree; and upon payment thereof within the time prescribed, the legal title of such portion as belonged to complainant and Esther A. Phillips, as aforesaid, should be required to be conveyed to complainant.

Nor will the court be prevented from making such final determination of the cause on account of the purchase by Prettyman, *pendente lite*, set up in defendants' answer; but such conveyance will be held in subservience to the rights of the parties in this litigation.

The decree of the court below dismissing the bill must be reversed and the cause remanded, with directions to the court below to proceed and render a decree in conformity with this opinion.

*Decree reversed.*