## RIDKY v. RIDKY.

1. HUSBAND AND WIFE—PREVIOUS TO STATUTORY RELIEF EARNINGS OF WIFE BELONGED TO HUSBAND.

Previous to the passage of Act No. 196, Pub. Acts 1911, all the earnings of a married woman belonged to her husband, as a matter of law.

2. SAME — PROPERTY SETTLEMENT FORCED BY WIFE BY UNJUST DIVORCE SUIT VOID.

Where a wife, as part of a plan to acquire to herself all

For authorities discussing the right of a married woman to recover for services rendered outside the home, see note in L. R. A. 1917E, 282.

of the joint property, began divorce proceedings without just cause, an agreement by the husband that she might take title in her own name to property they were jointly buying on contract, signed by him for the purpose of effecting a reconciliation for the sake of the family, *held*, void for want of valid consideration.

3. SAME—EARNINGS OF HUSBAND INVESTED BY WIFE HELD FOR MUTUAL BENEFIT.

That money earned by the husband and turned over by him to his wife was understood by both of them to be received by her and used for their mutual welfare, and that property in which any of it might be invested should be theirs in entireties, with right of survivorship, *held*, established by the record.

4. TRUSTS—RESULTING TRUST—STATUTE AGAINST RESULTING TRUST NOT APPLICABLE WHERE TITLE TAKEN WITHOUT CONSENT OF ONE PAYING CONSIDERATION.

The statute against resulting trusts where the grant is to one and the money paid by another (3 Comp. Laws 1915, § 11571) does not apply to cases where the alienee named has taken an absolute conveyance to himself without the knowledge or consent of the person paying the consideration, or, in violation of some trust, has purchased the lands so conveyed with moneys belonging to another (section 11573).

5. HUSBAND AND WIFE—FRAUD—EQUITY TAKES COGNIZANCE OF MENTAL ABILITY, ETC.

In passing upon the issues involved in a suit where a husband claims that the wife fraudulently took title in her own name to their home when it was mutually understood that it should be taken in their joint names by the entireties, a court of equity can and should recognize the disparity in intellectual force, ability, and business experience of the parties, their close fiduciary relations as husband and wife, the wife's dominant position in that relation during the many years of their married life, and their long settled plan of joint interest in their limited accumulations intrusted entirely to her management.

6. SAME—TRUSTS—WIFE IN INVESTING EARNINGS OF HUSBAND ACTS AS HIS AGENT.

Where a wife was intrusted with the entire management of the negotiations and purchase of a house with money belonging jointly to herself and husband, with the dis-

tinct understanding between them that the property purchased was to be for the benefit of both, she was acting as his agent in so far as his interests were involved, and it was therefore her duty to have the conveyance made to both, or if to herself alone for any reason, then to have a trust in his favor distinctly declared in the conveyance.

7. TRUSTS—CONSTRUCTIVE TRUST—CONSTRUCTIVE FRAUD.
   Constructive fraud is a basis for a constructive trust raised by equity to work a just result.

8. DIVORCE—ESTATES BY ENTIRETIES.
   The conclusion of the court below that the husband is entitled to a divorce, and that he has established his right in equity to recognition as joint owner by entireties with his wife of their home, *held*, justified by the proofs.

9. SAME — PROPERTY SETTLEMENT — EQUITY RECOGNIZES DUTY OF PARENTS TO INVALID DAUGHTER.
   While no strictly legal liability may be found as to an invalid daughter, a moral responsibility of both parents exists, which, in making equitable division of the property, on granting a divorce, a court of equity is not obliged to entirely ignore.

10. SAME—ALIMONY—MODIFICATION OF DECREE.
    Where the husband is yet able to earn as large wages as ever, while the wife's earning power is questionable, and she is burdened with an indebtedness on the home and with an invalid daughter, the decree of the court below giving him a $6,500 lien on the home worth $16,000 is, on appeal, reduced to $6,000 and, as modified, affirmed.

Appeal from Wayne; Driscoll (George O.), J., presiding.    Submitted October 4, 1923.    (Docket No. 29.)  · Decided April 10, 1924.

Bill by Charles J. Ridky against Theresa B. Ridky for the reformation of a deed.

Bill by Theresa B. Ridky against Charles J. Ridky for a divorce.    Both parties filed cross-bills, and the

cases were consolidated and heard as one.     From a decree for plaintiff Charles, defendant Theresa appeals. Modified and affirmed.

*Cass J. Jankowski,* for appellant.

*Edward D. Devine,* for appellee.

STEERE, J.     The two above-entitled chancery suits were by consent of counsel consolidated and heard together.     The parties to them are husband and wife, elderly people above 60 years of age, who were married in 1886 and lived together until about the time this litigation arose.     The bill filed by Charles J. Ridky, on July 1, 1919, is to reform a deed given to his wife, Theresa B. Ridky, of their home in Detroit, now valued at about $16,000, which he claimed it was agreed should be put in the name of both to hold by entireties as husband and wife.

The bill filed by her is for a divorce from him on the ground of extreme cruelty.     In his answer and cross-bill to her bill for divorce, he charges that she is a woman of ungovernable temper who on frequent occasions flew into a rage and would abuse and berate him without cause, refuse to get his meals and otherwise misuse and make life miserable for him to an extent amounting as related to extreme cruelty, for which reasons he also asked for a divorce.     The cases with answers to bills, cross-bills and answers to cross-bills were duly brought to issue and ultimately heard on pleadings and proofs taken in open court.     A carefully considered opinion was filed by the circuit judge who heard them.     After reviewing the testimony at length he granted a divorce between the parties, awarded the wife $500 in lieu of dower and gave to the husband a decretal judgment against her for $7,000 less the $500 granted to her in lieu of dower, or in effect $6,500, and made it a lien upon the

property in question, which the court said was the real "bone of contention in the family" and had been "acquired largely, if not entirely, through the fruits of his labors."

The most serious question raised in her appeal relates to division of the property. When these parties were married they practically had no money or property. She admits that she had none and he that he had but little, saying that a small lot for which he paid $200 was "probably the sum total of my possessions at that time." He was a tailor by trade and worked at that calling for some time after they were married. While following his trade during the earlier years of their married life his average earnings were not large and employment was uncertain. What he earned during that period is not clearly shown. He testified that he always supported his family and regularly turned his wages over to his wife for family purposes, except a small amount kept for his personal needs. The most he tells of earning as a tailor was $20 to $25 per week at a time when he got a job at piece work in St. Clair. He later quit his trade and found steady employment in Detroit. He worked for some time at the University building as an elevator man and night watchman, afterwards at the Free Press where he remained for about 9 years at $60 per month, and then found employment at the Ford automobile factory where he had been for 5 or 6 years, receiving $5 per day. Five children were born to them. Two died in infancy. They have 3 adult daughters. Two of them are married. The third, Viola, has suffered poor health from childhood and always remained in the family home. The two who are married received good educational advantages. One of them learned stenography and was employed in that line for some time before her marriage.

The property in controversy is the third home which

these parties have had.    Early in their married life they bought on contract with a small payment down a house "on Dubois and Harper" where they lived for a number of years and then sold their equity in it at a profit of $600.    Their second purchase was at 945 Joseph Campau avenue.    This they also bought on contract for $1,800 with a payment down of $600. It was their home for about 15 years, during which time they made improvements upon and paid for it. This property was conveyed to them in their joint names as husband and wife by the former owner, on June 25, 1913.    Each of those properties was bought and held by them jointly, in the names of both, although she had a memorandum of agreement signed by them, dated June 16, 1913, which provided amongst other things that the Campau avenue property where they then lived should be put in her name and authorizing the party from whom they held a land contract for it to convey the same to her on payment of the unpaid balance.    This agreement related to her withdrawal of a divorce suit she had commenced against him for which the trial court found there was no just cause and no conscionable consideration for the agreement, which he signed under a "species of duress" in order to effect "a reconciliation for the sake of the family."

In 1916 they sold their home on Joseph Campau avenue for $3,600 and she purchased the property in controversy here, known as 209 Montclair avenue, for $7,200, paying thereon the $3,600 received for the Campau avenue property and giving a mortgage for the balance.    The business was done by her and the title taken in her name.    At the time of hearing these cases $1,650 yet remained unpaid on the purchase price mortgage she gave on the property which the undisputed testimony showed was worth $16,000 when this litigation developed.

The story of the domestic life of these parties during the many years they lived together discloses as it runs in this ample record the not uncommon trials, disappointments and troubles, with occasional friction, incidental to sickness in the household, low wages or lack of employment for the wage earner of the family.    In her testimony Mrs. Ridky apparently charges all this to her husband, and magnifies it beyond credulity to an extent which renders it difficult to place any reliance upon many of her statements unless corroborated, or inadvertently made against her interests.    She evidently is a woman of dominant disposition with a violent temper when aroused. Early in their married life she took her place as head of the household and handled the purse strings, in which capacity it may be conceded she was more forceful and far-sighted than her husband.    He early recognized this adjustment of their domestic relations and as a rule turned over his wages to her, generally acquiescing in her management of their limited financial affairs though in certain particulars not always complacent.    He frankly admits that she sometimes irritated him to profanity but claims that she was equally proficient in that line of verbal contest, which she denies.    It is shown to have been on her initiative that they purchased a home and made the changes which followed, and that in those transactions she took charge of and conducted the business.    It is also fairly shown that when his conduct was not to her liking she did not hesitate to resort to the courts to suppress him.    The trial court found this was the fourth suit for divorce she had begun against him although she "has not now, and never had, any just cause for divorce."    With which we do not disagree.

Mrs. Ridky begins her story of their domestic infelicity with the statement—"My husband and I always had trouble through his people.    We always

had trouble. This is the fourth time I have had trouble with him. We had trouble all our lives. The cause of it was that he never would work." She then goes on to relate how their three children starved, she did not have money to buy soap to wash her first baby or to buy nourishment, that she had to "steal coal from the trains." He was always rough to her and the children, profane and abusive; that he always had good clothes and she had nothing, and many other acts of misconduct on his part which if true would furnish grounds for divorce.

The overwhelming weight of testimony is to the effect that he was an industrious man of good habits and kindly disposition who as a rule worked steadily in some employment and regularly turned over most of his wages to his wife. On cross-examination she to a degree admits such was his practice; that when his wages were small and he was earning but $12 per week he kept $2.50 and gave her the balance and when he earned larger wages he gave her more. Their home on Montclair was a double apartment house. After they moved there she received rent from the portion they did not occupy. With his increased wages at the Ford plant, of which he turned over $100 a month to her, she was able not only to make payments on the home but purchase a Buick car and indulge in other conveniences. The following in the opinion filed by the trial court is well sustained by the testimony:

"The only time he did not work was when there was no work to be found. When he was not working elsewhere he was working around the home doing painting, beating rugs and the like. Mrs. Mary Murray, a disinterested and very creditable witness, lived in the same house with these parties for 2½ years on Montclair. She could hear what was going on in the Ridky apartment. She says they had no arguments to amount to anything. He would sputter out at times but it would only last a few minutes and then

he was as nice as could be.    When he talked cross she talked back.    He was the kindest father in the world. He always said good bye to Viola before going to work when she was sick.    'Anybody that tried to get along with him could and have a good husband.'    Theresa, the parties' oldest daughter, testified: that her mother could swear just as bad as her father; that her mother has an awful temper; that 'if you treat father nice he'll be nice to you;' that he is very good-natured and good-hearted; that he would find fault once in a while but was most of the time all right; that he worked every day when he could get work and gave her mother all his money."

She also testified that her father never drank and wasn't extravagant; that when he worked at the Free Press he would bring home repair work for men he knew, pressing and repairing their clothing and hand that extra money over to her mother.    Of the trouble about their families, of which her mother spoke, she said that her mother always complained because her father went to see his old mother who was yet living and about 83 years of age at the time she testified; that he was in the habit of visiting his mother every Sunday, would sometimes go to church first and over to visit his mother during the rest of the day and her mother complained of this, insisting that his place was at home with his family.    The other married daughter testified to like effect of the conduct and character of her parents.    A nephew of Mrs. Ridky named Wagner, on the police force of the city and living with the family for a time, said he never saw any trouble between them except some little argument; Ridky was never abusive around there, that when they got a car he drove it for Mrs. Ridky and she gave him strict instructions not to teach her husband to run it as she didn't want him to learn to drive a car because if he did he would take his mother out driving on Sundays; that Ridky seemed to have very little money with him, having, as witness understood,

turned what he had over to his wife; that he worked steadily, liked to take and crack a joke and was always a pleasant, "happy-go-lucky sort of fellow" as far back as he could remember.

In the family alignment Viola, who yet lived at home with her mother, was a witness for her and gave like testimony, with occasional innocent lapses which distinctly contradicted many of her own and her mother's charges of her father's turpitude, and tended to throw some light on the real relations of these parties and actual conditions in that family.    Some excerpts from her testimony run as follows:

"I remember that mamma commenced a divorce case. This is the fourth time.    He made an arrangement with mother if she would withdraw the suit.    He promised faithfully; he said 'Tress, I will be good, and sign all my money to you if you will take me back.' Mamma said she wouldn't under any condition.    She said, 'I can't love you any more.    I don't want anything.'    He said 'I will sign everything.'    And he did.    Then another suit was commenced after that just recently.    *    *    *    When he finally agreed to behave himself she would take him back, that is, the last divorce suit, my mamma then bought this property.    *    *    *    There was no harmony.    His conduct was he didn't like to have company.    If we had friends down papa used to insult our friends.    He would always talk about 'our fifty-fifty.'    He always thought we wanted to be swell.    He even objected to our buying a machine and getting out with other people.    *    *    *    He said he didn't want to have strangers to drive our machine.    I couldn't say this caused a break in our home.    It wasn't on account of those other fellows, it was because he was going to get his name on the property and mother says 'you never shall.'    *    *    *    He was good in every way but he was always swearing and nagging.    That is the only fault he had.    *    *    *    Mother has quite a temper, just like dad's.    *    *    *    Father when he used to complain to mother, it was too much expense he would always say that—my mother was the boss of the house. She would not go ahead and make expenditures of

one kind or another without consulting him.    Mother never did that.    She went to him for everything first. Then if he said no, she would do it anyhow."

While Mrs. Ridky testified that she earned money by china painting, dress-making and keeping roomers, she does not give dates or amounts and her testimony that she furnished the money to purchase their homes from her individual earnings is not sustained by the record.    All her earnings would belong as a matter of law to her husband until Act No. 196, Pub. Acts 1911 (3 Comp. Laws 1915, § 11478), went into effect and it is convincingly shown that their mutual understanding, and the plan of their married life, was a joint ownership of their accumulations, or "fifty-fifty" as Ridky frequently stated it, until she outgeneraled him by taking and keeping the title to their third home in her own name and refused to recognize his interest.    He was the wage earner of the family. There is no warrant for saying that his wages which he regularly turned over to his wife were intended or understood to be an individual gift to her.    It is not an uncommon practice amongst laboring people circumstanced as they were and dependent upon the earnings of the husband for him to regularly turn over most or all of his wages to his wife, as their joint hoard to be kept and disbursed by her as conditions warrant, largely in her discretion but in a sense as his agent acting for their common good.

Their two preceding homes were so bought and held, all the business being transacted by her.    When she wanted to sell the second and purchase another in a more congenial neighborhood he yielded to her wishes with a like understanding as before, that she should, acting for both, negotiate and purchase the property from the grantor without his participation in the transaction and when that was effected the property should be put and stand in their joint names as tenants by entirety for their mutual benefit and protection.

This is not a simple case of a husband gratuitously deeding realty he owned to his wife or directing the grantor from whom he purchased it to do so, and later because of change in domestic conditions or for other reasons seeking to have the deed set aside and recall the gift.     Ridky was a nonparticipant in her purchase of this property from a third party, a stranger who conveyed title to her in her own name, she using for that purpose their family fund accumulated as above described.

Her claim of right under their agreement of June 16, 1913, to take and retain title to this property as absolute owner is not tenable.     Their second home to which that agreement related was deeded to them as tenants in entirety by the grantor and no question of fraud or imposition is claimed in that connection. Had the divorce suit which was discontinued at the time of the agreement been a meritorious one there might have been a valid consideration involved.    The trial court correctly found, however, that it was not meritorious, but rather in furtherance of her then conceived purpose to control his conduct and ultimately acquire to herself all their property.    The history of their married life is persuasive that it was the intention and understanding between the parties as he turned over his wages to her that the money she received from him was jointly theirs for their mutual welfare, that property in which any of it might be invested should be theirs in entireties, and on the death of either a survivorship to the other.

It is manifest from their own testimony and shown by the record as a whole that she was the master spirit who not only ruled the household, husband and their business affairs, but in mental capacity, business experience and ability was his superior.    His efforts during their married life were limited to working for wages and turning the bulk of them over to his wife to handle in her discretion for their common good.

He recognized her superior capacity in those particulars and was content that she manage their financial affairs, with little knowledge of or attempt on his part to learn the details, content with their agreement and domestic policy of common interests with their home jointly held to protect the survivor. He says that she treated him "like I was a little bit of a boy," and the evidence indicates that in business matters at least she was not far wrong in so sizing him up.

His positive testimony that when he consented to selling the old home and buying the present one they expressly agreed that when she had secured the property it should belong to and be in the names of both, while indicative of their joint ownership of the funds she used is, as her counsel contends, incompetent to establish an enforceable contract to defeat her legal title, under the statute of frauds and rule of evidence forbidding oral proof to vary the terms of a written instrument. Our statute against resulting trusts where the grant is to one and the money paid by another (3 Comp. Laws 1915, § 11571) does not apply to cases where the alienee named has taken an absolute conveyance to himself without the knowledge or consent of the person paying the consideration, or, in violation of some trust, has purchased the lands so conveyed with moneys belonging to another (3 Comp. Laws 1915, § 11573); but the theory of Ridky's bill of complaint is a fraudulent violation of her trust obligations to handle their joint resources in the interest of both by taking and retaining title to realty bought with their joint money, claiming to be the sole owner and refusing to recognize his interest.

It is further urged in her behalf that no part of the money she invested in the present home was his for the reason that prior to the sale of the Campau avenue property Ridky gave a deed of it to his wife, making her owner of the property and consequently owner of the money received from its sale. His

contention is that his deed to her was but a preparatory step in furtherance of their project to sell that home and invest the proceeds in a new one, the handling of the transaction being intrusted to her.    Of the details he had little knowledge and but hazy ideas of how the business was or should be done, which resulted at times in his giving confused answers; but throughout he consistently asserted that he consented to their selling the old home and buying the new under a fully discussed and distinct agreement that as ultimately worked out by her their joint interest should be vested in the new home as in the former ones.    His manner of telling it is in part as follows:

"She found the place and I went to work and give her the privilege to buy it; that I would help her along.    She said she would sign that property to me.    She said, 'then I will see to it when you get your $5 a day, so as to lose no time.    I will see to that, and when it is ready you can sign with it, and it will be fifty-fifty.'  *  *  *  I wanted to see the paper, but she wouldn't let me see it.    She hid the paper so I could not see it.    I found out—I heard her—she said she wouldn't tell me.    She said 'the property is mine.    I am boss here.'  *  *  *  She got things anyhow to suit herself.    Of course her name was on the paper."

In passing upon the issues of this case a court of equity can and should recognize the disparity in intellectual force, ability and business experience of these parties, their close fiduciary relations as husband and wife, her dominant position in that relation during the many years of their married life, and their long settled plan of joint interest in their limited accumulations, intrusted entirely to her management.    In *Fretz* v. *Roth*, 68 N. J. Eq. 516 (59 Atl. 676), a case in many particulars analogous to this, the significance of such circumstances is fully recognized and instructively discussed.    *Vide,* also, *Beck* v. *Beck,* 77 N. J. Eq. 51 (75 Atl. 228).

In purchasing this property Mrs. Ridky was acting as agent for her husband so far as his interests were involved.    She was intrusted with the entire management of the negotiations and purchase.    It was distinctly understood between them that the transfer by the grantor of the property purchased was to be for the benefit of both.    It was therefore her duty to have the conveyance made to both or if to herself alone for any reason, then to have a trust in his favor distinctly declared in the conveyance.    Under suggested facts somewhat analogous it was said by Justice COOLEY in *Fisher* v. *Fobes*, 22 Mich. 454:

"If he (the agent) failed to have the conveyance made in proper form for protection of complainant's interests, he would have been chargeable with constructive fraud, and a court of equity would have given complainant the proper relief."

Constructive fraud is a basis for a constructive trust, raised by equity to work a just result.

"All instances of constructive trust may be referred to what equity denominates 'fraud,' either actual or constructive, including acts or omissions in violation of fiduciary obligations.    If one party obtains the legal title to property, not only by fraud, or by violation of confidence or of fiduciary relations, but in any other unconscientious manner, so that he cannot equitably retain the property which really belongs to another, equity carries out its theory of a double ownership, equitable and legal, by impressing a constructive trust upon the property in favor of the one who is in good conscience entitled to it, and who is considered in equity as the beneficial owner.    1 Pomeroy, Equity Jurisprudence, § 155." *Nester* v. *Gross*, 66 Minn. 371 (69 N. W. 39).

Ridky's bill contains a concluding general prayer for such relief as the court may find agreeable to equity and good conscience.    We do not disagree with the conclusion of the trial court that under the proofs Ridky is entitled to a divorce and that he has estab-

lished his right in equity to recognition as joint owner by entireties with his wife of their home, and that it would be unjust "to send him into the world penniless at this day." Finding that to decree and leave the title in their names as joint owners would, in the light of their past history, but breed further trouble and contention, the court made disposition of their property interests as related. This relieves him of all family expense and responsibility with a secured judgment against her of $6,500, and leaves her their home burdened by an indebtedness of over $8,000 and their invalid daughter on her hands. While no strictly legal liability may be found as to this daughter, a moral responsibility exists as to both which, in making equitable division of property on granting divorce, a court of equity is not obliged to entirely ignore. He is yet able to work and earn as large wages as he ever received in his life, while her earning power is questionable and ownership of the home subject to such incumbrance involves contingencies. Although he was the wage earner of the family, it must be conceded that her business ability and foresight, as to which he was apparently subnormal, were important factors in their acquiring this property.

The decretal judgment in his favor will be modified to $6,000 and, so modified, the decree will stand affirmed, without costs to either party.

CLARK, C. J., and McDONALD, BIRD, SHARPE, MOORE, FELLOWS, and WIEST, JJ., concurred.